**ORAL ARGUMENT NOT YET SCHEDULED**

**CASE NO. 22-7111**

# IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA

―――――――――

MELCHIOR A. GEORGE,

*Plaintiff - Appellant,*

v.

MOLSON COORS BEVERAGE COMPANY USA, LLC,

*Defendant - Appellee.*

―――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

―――――――――

**RESPONSE BRIEF OF APPELLEE**

―――――――――

Hans P. Riede
Sarah A. Belger
QUARLES & BRADY LLP
1701 Pennsylvania Avenue, NW, Suite 700
Washington, D.C. 20006
202-372-9600
hans.riede@quarles.com
sarah.belger@quarles.com

*Counsel for Appellee*

No. 22-7111

_____

IN THE UNITED STATES COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT

_____

MELCHIOR A. GEORGE

Appellant,

v.

MOLSON COORS BEVERAGE COMPANY USA, LLC

Appellee.

_____

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Defendant-Appellee, Molson Coors Beverage Company USA, LLC, certifies as
follows:

**A.    Parties and Amici**

The Plaintiff-Appellant in this appeal is Melchior A. George. The Defendant-
Appellee is Molson Coors Beverage Company USA, LLC. There were no amici before the
district court, and none are anticipated in this Court.

**B.    Ruling Under Review**

The Plaintiff-Appellant is appealing from the July 8, 2022 Order in this case by
the United States District Court for the District of Columbia [U.S.D.C. Dkt. 37], and the
accompanying Memorandum Opinion [U.S.D.C. Dkt. 36], dated July 8, 2022 (Trevor
N. McFadden, U.S.D.J.), granting Defendant's Motion for Summary Judgment.

**C.     Related Cases**

This case has not previously been before this or any other court aside from the

underlying trial court from which this matter is appealed. Counsel for Defendant-Appellee is

not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

August 31, 2022                                      */s/ Hans Paul Riede*
                                                     Hans Paul Riede (DC Bar No. 1001728)
                                                     Sarah A. Belger (DC Bar No. 986105)
                                                     Christian A. Yingling (DC Bar No. 1739397)
                                                     Quarles & Brady LLP
                                                     1701 Pennsylvania Avenue
                                                     Suite 700
                                                     Washington, DC 20006
                                                     Telephone: (202) 372-9529
                                                     Facsimile: (202) 372-9571
                                                     Hans.Riede@quarles.com
                                                     Sarah.Belger@quarles.com
                                                     Christian.Yingling@quarles.com

                                                     *Counsel for Defendant Molson Coors*
                                                     *Beverage Company USA, LLC*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PARTIES

TABLE OF AUTHORITIES ...................................................................... iii

GLOSSARY OF ABBREVIATIONS ...................................................... vii

PERTINENT STATUTES AND REGULATIONS .................................... 1

STATEMENT OF THE CASE.................................................................... 1

    A.    Mr. George Worked on the Buffalo Wild Wings Account and Spent at Least Half of His Working Time Traveling Across the Eastern Half of the United States ................................................ 1

    B.    Mr. George's Illness and 2018 Performance Review ................. 5

    C.    Molson Coors' EEO Policies...................................................... 9

    D.    Mr. George's Travel Restrictions and Request for Accommodation .......................................................................... 10

    E.    Mr. George's Allegations of Disability Discrimination Under the D.C. Human Rights Act.............................................................. 21

    F.    Mr. George's Allegations of Retaliation in Violation of the FMLA ......................................................................................... 22

SUMMARY OF ARGUMENT ............................................................... 22

    Count One of the Amended Complaint ............................................ 24

    Count Three of the Amended Complaint......................................... 24

ARGUMENT .......................................................................................... 24

    I.    STANDARD OF REVIEW...................................................... 24

i

II.   THE DISTRICT COURT PROPERLY DISMISSED MR. GEORGE'S DISABILITY DISCRIMINATION CLAIM IN COUNT I ...................................................................25

   A.   Molson Coors Did Not Illegally Fail to Provide Mr. George with a Reasonable Accommodation .................................................26

      1.   The undisputed facts establish that travel beyond a three-hour driving radius of Washington Hospital Center was an essential function of the National Account Executive position .........................................27

      2.   The Undisputed Facts Establish that Molson Coors Engaged in a Robust and Legally Sufficient Interactive Accommodation Process.............................................32

   B.   The Only Vacant Position in the Washington Area Also Required Travel Beyond a Three-Hour Radius as an Essential Function, and Zero Evidence Exists Showing Molson Coors Intentionally Avoided its Obligations Under the DCHRA..................................................................36

III.   THE COURT SHOULD AFFIRM THE DISMISSAL OF MR. GEORGE'S FMLA RETALIATION CLAIM .......................................41

CONCLUSION....................................................................................47

CERTIFICATE OF COMPLIANCE......................................................48

CERTIFICATE OF SERVICE .............................................................49

ADDENDUM OF PERTINENT STATUTES AND REGULATIONS

## TABLE OF AUTHORITIES

### Cases

*Adeyemi v. District of Columbia*,
    525 F.3d 1222 (D.C. Cir. 2008) ......................................................... 41

*Aka v. Washington Hosp. Ctr.*,
    156 F.3d 1284 (D.C. Cir. 1998) ......................................... 26, 36, 38

*Alford v. Providence Hosp.*,
    945 F. Supp. 2d 98 (D.D.C. 2013), *aff'd*, 561 F. App'x 13
    (D.C. Cir. 2014) ......................................................................... 42, 45

*Allen v. Johnson*,
    795 F.3d 34 (D.C. Cir. 2015) ........................................................... 43

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................... 23, 25

*Atanus v. Sebelius*,
    652 F. Supp. 2d 4 (D.D.C. 2009), *aff'd*, No. 09-5387, 2010 WL 1255937
    (D.C. Cir. Mar. 2, 2010) ................................................................. 41

*Brady v. Off. of the Sergeant at Arms*,
    520 F.3d 490 (D.C. Cir. 2008) ......................................................... 26

*Brown v. Brody*,
    199 F.3d 446 (D.C. Cir. 1999) ......................................................... 35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ......................................................................... 25

*Doak v. Johnson*,
    798 F.3d 1096 (D.C. Cir. 2015) ....................................................... 27

*Dogmanits v. Capital Blue Cross*,
    413 F. Supp. 2d 452 (E.D. Pa. 2005) ............................................... 39

*Dougherty v. CNN*,
    396 F. Supp. 3d 84 (D.D.C. 2019) ................................................... 32

*Floyd v. Lee*,
    85 F. Supp. 3d 482 (D.D.C. 2015) ............................................. 23, 37

*Galvin v. Eli Lilly & Co.*,
  488 F.3d 1026 (D.C. Cir. 2007) ........................................................ 31

*George v. Leavitt*,
  407 F.3d 405 (D.C. Cir. 2005) ......................................................... 26

*Giles v. Transit Emps. Credit Union*,
  32 F. Supp. 3d 66 (D.D.C. 2014) ..................................................... 25

*Giles v. Transit Emps. Fed. Credit Union*,
  794 F.3d 1 (D.C. Cir. 2015) ............................................................. 25

*Hancock v. Washington Hosp. Ctr.*,
  13 F. Supp. 3d 1 (D.D.C. 2014), *aff'd*, 618 F. App'x 4 (D.C. Cir. 2015) ......... 32

*Hunt v. District of Columbia*,
  66 A.3d 987 (D.C. 2013) ................................................................. 28

*Jenkins v. D.C.*,
  223 A.3d 884 (D.C. 2020) ............................................................... 34

*Jones v. University of the Dist. of Columbia*,
  505 F. Supp. 2d 78 (D.D.C. 2007) ............................................... 36, 37

*Khan v. Holder*,
  37 F. Supp. 3d 213 (D.D.C. 2014) ................................................... 45

*Louis v. Hagel*,
  177 F. Supp. 3d 401 (D.D.C. 2016) ............................................. 28-29

*Mack v. Georgetown Univ.*,
  No. 15-CV-793 (RMC/GMH), 2017 WL 4325596 (D.D.C. Aug. 4, 2017),
  *report and recommendation adopted,* No. CV 15-793 (RMC),
  2017 WL 4325617 (D.D.C. Sept. 27, 2017), *aff'd*, No. 17-7139,
  2018 WL 3156846 (D.C. Cir. May 24, 2018) ................................. 31

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) .................................................................. 26, 43

*Minter v. District of Columbia*,
  809 F.3d 66 (D.C. Cir. 2015) ............................................. 24, 35, 39, 41

*Nurriddin v. Goldin*,
  382 F. Supp. 2d 79 (D.D.C. 2005), *aff'd*, *Nurriddin v. Griffin*,
  222 Fed. Appx. 5 (D.C. Cir. 2007) ........................................... 45, 46

iv

*Oviedo v. Washington Metro. Area Transit Auth.*,
   948 F.3d 386 (D.C. Cir. 2020) ......................................................... 24

*Peters v. City of Mauston*,
   311 F.3d 835 (7th Cir. 2002) ......................................................... 37

*Phelps v. Optima Health, Inc.*,
   251 F.3d 21 (1st Cir. 2001) ......................................................... 32

*Pyramid Secur., Ltd. v. IB Resolution, Inc.*,
   924 F.2d 1114 (D.C. Cir. 1991) ......................................................... 31

*Roche v. John Hancock Mutual Life Ins. Co.*,
   81 F.3d 249 (1st Cir. 1996) ......................................................... 34

*Roseboro v. Billington*,
   606 F. Supp. 2d 104 (D.D.C. 2009) ......................................................... 42, 43

*Saunders v. Galliher & Huguely Assocs., Inc.*,
   741 F. Supp. 2d 245 (D.D.C. 2010) ......................................................... 36, 37

*Solomon v. Vilsack*,
   763 F.3d 1 (D.C. Cir. 2014) ......................................................... 29

*Swanks v. Washington Metro. Area Transit Auth.*,
   116 F.3d 582 (D.C. Cir. 1997) ......................................................... 21

*Swanks v. Washington Metro. Area Transit Auth.*,
   179 F.3d 929 (D.C. Cir. 1999) ......................................................... 26

*Taylor v. Solis*,
   571 F.3d 1313 (D.C. Cir. 2009) ......................................................... 46

*Thomas v. District of Columbia*,
   227 F. Supp. 3d 88 (D.D.C. 2016) ......................................................... 43

*Walker v. Johnson*,
   798 F.3d 1085 (D.C. Cir. 2015) ......................................................... 43

*Ward v. McDonald*,
   762 F.3d 24 (D.C. Cir. 2014) ......................................................... 27-28, 33

*Weigert v. Georgetown Univ.*,
   120 F. Supp. 2d 1 (D.D.C. 2000) ......................................................... 27

## Statutes

29 U.S.C. § 2601 ................................................................................... 24

42 U.S.C. § 12101 ................................................................................. 11

42 U.S.C. § 12111 ................................................................................. 27

42 U.S.C. § 12112 ................................................................................. 38

D.C. Code § 2-1401.01 ......................................................................... 24

## Other Authorities

Fed. R. Civ. P. 56 ................................................................................. 25

Fed. R. Evid. 201 ................................................................................. 28

# GLOSSARY OF ABBREVIATIONS

"ADA"            refers to the Americans with Disabilities Act.

"DCHRA"          refers to the District of Columbia Human Rights Act.

"District Court"  refers to the United States District Court for the District of
                 Columbia.

"FMLA"           refers to the Family and Medical Leave Act.

"JA"             refers to the Joint Appendix.

"Molson Coors"   refers to Molson Coors Beverage Company USA, LLC.

## PERTINENT STATUTES AND REGULATIONS

An addendum of pertinent statutes and regulations appears at the end of this brief.

## STATEMENT OF THE CASE

**A.     Mr. George Worked on the Buffalo Wild Wings Account and Spent at Least Half of His Working Time Traveling Across the Eastern Half of the United States.**

With the exception of a two-year stint with another company from 1998 until 2000, Mr. George worked for Molson Coors from 1991 until November 25, 2019. Joint Appendix ("JA") 31 ¶ 17; JA 49:17-21; 93:5-14; JA 102.  In November 2011, Mr. George was promoted to National Account Executive for the Buffalo Wild Wings account for the eastern half of the United States (from the Mississippi River east from Maine to Florida).  JA 307 ¶ 3, 8; JA 58:16-59:4.

He serviced the Buffalo Wild Wings customer and stakeholders for the entire eastern half of the United States, and his job duties included: accountability  for  profitably managing business results (volume, share, profit) for Buffalo Wild Wings, developing the account sales plan and facilitating its implementation, ensuring that products and programs are executed in chain retailers by coordinating the sales and distribution, building value-enhancing relationships with retailers through responsive problem solving and proactive relationship management.  JA 111-114.

1

Molson Coors' Buffalo Wild Wings business includes 1240 locations across all 50 states. It is Molson Coors' largest customer in the on-premise business. JA 130:15-131:10. Mr. George testified that he often was required to travel in his role on the Buffalo Wild Wings account. "Q. Isn't it true that you traveled frequently in that role up to the point where you got sick? I mean, wasn't – wasn't travel a big part of the position? A. It was." JA 59:8-12.

Before he became ill, and according to his own sworn testimony, Mr. George traveled outside of the Washington, D.C. area by airplane at least 40 to 50% of his working time and would stay in hotels. JA 60:14-22; JA 63:5-9. Mr. George also admitted that his expected minimum physical travel was 60%. JA 119. Mr. George traveled to participate in meeting presentations, attend dinner presentations, call on retail customers, and provide entertainment for large groups of key stakeholders. JA 61:17-62:7. The key stakeholders with whom Mr. George interacted included distributors, Buffalo Wild Wings franchise owners and employees, and corporate employees of Buffalo Wild Wings. JA 66:13-16.

Christopher Gick is Vice President of National Accounts, which includes Buffalo Wild Wings. JA 153:20-21. He has held this role since November 2017. JA 153:22- 154:3-10. As a National Account Executive, Mr. George reported to Greg Miller, who reported to Mr. Gick. JA 155:2-6; JA 155:20-156:10.

2

Mr. Miller left the company in October 2018. JA 43-44. After Mr. Miller's departure, Mr. Gick began to supervise Mr. George directly for a short period of time in 2018. JA 156:16-18.[1]

In 2018, Mr. George's geographic territory (Eastern half of the United States) covered five out of the eight Buffalo Wild Wings Regional Vice Presidents and, according to Mr. George's own admission, "a disproportionate amount of the largest franchise groups."  JA 329; JA 307 ¶ 8. In his role, he was required to see the Regional Vice Presidents on a regular basis.  JA 143:14-144:2.

According to Mr. George's Job Profile for the National Account Executive position, "[a]pproximately 50-60% travel is associated with this position.  JA 111. Mr. George was to "[b]uild[] value-enhancing relationships with retailers through

---

[1]     Mr. George argues that neither Ms. Winter nor Mr. Gick ever supervised him; however, this is inconsistent with the record.  He appears to use a hyper-technical and inaccurate definition of the word "supervise" while he was on FMLA leave and appears to claim that no one could have been his supervisor while he was on leave. It is undisputed, however, under Molson Coors' reporting structure, that Mr. George reported to Mr. Gick in late 2018 and early 2019 (during which time Mr. George was in and out of the hospital but was not on FMLA leave and was periodically working) and reported to Ms. Winter starting in approximately February 2019.  JA 134:4-7, JA 273:18-274:1 (stating once Mr. George went on FMLA leave his position was open and Ms. Winter was waiting for him to come back).  Both Mr. George and Ms. Winter reported to Greg Miller in 2018, who in turn reported to Mr. Gick.  JA 156:8-15; 133:20-134:2. Ms. Winter served as Mr. George's counterpart in the western half of the United States on the Buffalo Wild Wings account in 2018 and then covered Mr. George's half when he began FMLA leave on February 23, 2019. JA 133:20-134:7. Thus, she was familiar with the stakeholders in his territory and the requirements for that position. JA 143:14-144:11; JA 371 ¶¶ 3, 12.

category management application, responsive problem solving and proactive relationship management." JA 111. The position required him to "identif[y], build[], and maintain[] cooperative relationships that are of significance to the business success of MillerCoors. These relationships include both internal and external stakeholders such as distributors, customers, cross functional colleagues, and key industry groups." JA 113.

Jean Winter[2] replaced Greg Miller as Mr. George's supervisor when she was promoted to Chain Sales Executive over the Buffalo Wild Wings business for the entire United States in approximately February 2019. JA 134:4-7.[3] Before Ms. Winter became Mr. George's supervisor, they were both National Account Executives calling on Buffalo Wild Wings, with Ms. Winter covering the western half of the United States and Mr. George calling on the eastern half. JA 133:9-15. In 2019, Ms. Winter had two direct reports: one of whom was Mr. George who was in charge of the Buffalo Wild Wings account for the eastern half of the United States. JA 131:18-132:1.

---

[2]     Ms. Winter now goes by Jean Delaney but is referred to as Ms. Winter for clarity.

[3]     In 2018, there was an approximate three-month gap before Ms. Winter replaced Mr. Miller, and Mr. George directly reported to Mr. Gick during this short time. JA 156:16-18; JA157:21-158:18.

### B.    Mr. George's Illness and 2018 Performance Review.

Mr. George had bouts of passing out, dizziness, and "debilitating nausea" between July and September 2018. JA 57:8-18; JA 89:16-19.  He was in and out of the hospital multiple times between November 2018 and February 2019, and at times, he would remain in the hospital for several days. JA 173:20-174:8.[4]  By February 2019, Mr. George's condition worsened, and he went on FMLA leave on February 23, 2019, in accordance with the company's FMLA policy. JA 77:16-19; JA 177-187.  Molson Coors' FMLA leave policy "prohibits retaliation of any kind against eligible employees exercising their statutory rights." JA 187.

---

[4]    Mr. George plays "fast and loose" with the timing of when he was on FMLA leave and inaccurately uses the terms "FMLA leave" and "medical leave" interchangeably.  Mr. George did not begin FMLA leave until February 23, 2019. JA 77:16-19; JA 177-187. He was in and out of the hospital and working at various times during late 2018 and in early 2019 prior to February 23; however, he was not on protected FMLA leave during this time. *Id.* Mr. George attempts to argue that he was unfairly penalized for things that occurred while he was "managing his illness" and on "medical leave." Br. of Appellant at 7.  Putting aside the artful drafting by his counsel, it is important to note Mr. George's performance review was based on his performance in 2018, and it is undisputed that Mr. George was not on protected FMLA leave until February 23, 2019.  JA 77:16-19; JA 426-35 (all discussions in the 2018 Performance Review describe 2018).  Ms. Winter testified that he heard negative things about Mr. George from some of his customers while she was covering his business, meaning she heard these things relating to conduct that occurred prior to February 23, 2019.  JA 278:3-279:9; JA 372 ¶ 11.  The record establishes that Mr. George received his 2018 performance review on or soon after February 28, 2019, and he sent an email contesting it on or about March 11, 2019. JA 328-330.

Mr. Gick wrote Mr. George's review for 2018. JA 163:6-8. Ms. Winter was one of several individuals who gave Mr. Gick feedback on Mr. George's performance in 2018. JA 135:3-136:18. Ms. Winter noticed that Mr. George often did not respond to voicemails and emails and lacked a sense of urgency. *Id.*[5]

Ms. Winter primarily covered Mr. George's business while he was in and out of the hospital and on medical leave. During this time, she learned that although Mr. George thought he was doing a good job, the feeling was not mutual from some of his customers and internal Molson Coors employees supporting the business. JA 137:2-9.[6]

---

[5]     Mr. George implies that Ms. Winter was speaking about a time when he was on protected FMLA leave (Br. of Appellant at 7); however, the record establishes that Mr. George was "aloof" with customers and did not respond to voicemails from stakeholders before he went on FMLA leave. JA 327-330 (E-mail string discussing the 2018 review Mr. Gick and Ms. Winter discussed with Mr. George on or about February 28, 2019, and establishing Ms. Jean received reports that Mr. George was "aloof, not leading from the front, isn't responsive. Sense of urgency lacking" prior to Mr. George receiving the review. JA 372 ¶ 11. Contrary to Mr. George's contention, Mr. Gick never said he had no opportunity to observe the alleged behavior he described in Mr. George's evaluation, and the citations Mr. George identifies do not support this contention. Br. of Appellant at 7-8 (citing JA 317:5-8, 315:21-316:18; JA 327-30).

[6]     Mr. George claims that Ms. Winter did not cover Mr. George's role and instead, Mr. George's duties were covered by a "string" of various people. Br. of Appellant at 10. Once again, Mr. George misrepresents the record. It is undisputed that Ms. Winter covered Mr. George's role while he was on FMLA leave. JA 141:16-142:19. On August 26, 2019, more than ***three months after Mr. George exhausted his FMLA leave*** and after Mr. George exhausted his short-term disability leave, Mr. Gick and Ms. Nellans discussed the potential short-term coverage of Mr. George's role moving forward given that Mr. George could not yet return from leave.

Mr. Gick testified that he received feedback for the 2018 review that Mr. George was aloof, meaning Mr. George was not leading the business, leading solutions and engagement with the customer. JA 164:7-11.  Mr. Gick wrote on Mr. George's review, "I have received feedback from the field that you are sometimes aloof, not visible or not engaged. You need to improve your image with some of the field teams. Need an action plan here."  JA 432.

Mr. George's overall performance rating for 2018 was "Developing" or a 2 out of a 5 rating scale, with 5 being the highest. Although he received "Successful" (or a 3) ratings in some performance categories such as "Hit Volume Plan," he also received "Developing" ratings in several categories. Mr. Gick wrote: "Volume and distribution results were good with volume impacted significantly by $5 pitchers. However, his overall rating was impacted disproportionately by his 'How we Work' scores. I am looking for Mel to change his approach and delivery with the field teams. As outlined in the 'How we Work' section, I believe Mel has an opportunity to be more visible, lead from the front and connect for Buffalo Wild Wings." JA 434.

As a result of the 2018 review, Mr. George received a merit increase of 1.5% ($2,301.84) and a bonus in the amount of $5,971.00. JA 189.  The 2019

---

JA 192, 194-96, 332.  Ms. Nellans suggested short-term coverage in the form of a developmental assignment offer to Adam Bradbury, and that is what triggered Mr. Gick's response.  JA 332.

Personal Compensation Statement and the Guide to the 2018 Molson Coors Incentive Plan explain how the bonus was calculated for calendar year 2018 (paid out in Spring 2019). JA 189-190; JA 437-46; JA 139:22-140:12.

Fifty percent of the bonus metric is based on company performance (based on four financial targets equally weighted) and fifty percent is based on an employee's individual performance. JA 438. 2018 was a bad year for Molson Coors on the Buffalo Wild Wings account with slow traffic and fewer sales. JA 138:4-14; JA 82:15-22. Ms. Winter, who was Mr. George's counterpart for the western half of the account in 2018, received the smallest bonus she had ever received in 2019. JA 139:2-13. Mr. George conceded that everyone received lower bonuses in 2019 because the company overall performed poorly in 2018. JA 83:1-6.

Although Mr. George believes his 2019 bonus payment should have been higher, he does not recall how he calculated the $40,000 figure he claims he should have received. JA 84:14-21. Mr. George could not identify anyone who received an exception to the calculations and metrics described in Molson Coors' bonus plan. JA 85:3-19; JA 86:20-88:7.

Mr. George learned he had congestive heart failure and needed a heart transplant, and he received one in May 2019. JA 56:7-20. By April 26, 2019, the Buffalo Wild Wings East account was trending downward in revenue versus the previous year from target. JA 159:15-152:6. Also, distribution, or the placement of

different Molson Coors products ("brand portfolio") on the Buffalo Wild Wings East account, was trending downward in early 2019 compared to the previous year and were not on target. JA 161:15- 162:1.[7]

Mr. George exhausted his FMLA leave on May 19, 2019. JA 192. He exhausted his short-term disability benefits and leave on August 22, 2019, and was approved for long-term disability benefits effective the same day. JA 194-196. Mr. George received long-term disability benefits until August 21, 2021. JA 198-200.

Mr. George claims that "BWW awarded him its Vendor of the Year Award in 2019." Br. of Appellant at 8. However, the undisputed facts establish that Buffalo Wild Wings awarded Molson Coors the Vendor of the Year award, not Mr. George personally, and the award was given to Ms. Winter, Mr. Miller and Mr. George as a team. JA 281:3-282:4.

### C.    Molson Coors' EEO Policies.

Molson Coors' EEO policy includes a provision on requesting job-related accommodations:

> As an equal opportunity employer, MCBC recognizes that individuals with physical or mental impairments may require reasonable accommodations to

---

[7]    Mr. George spuriously claims Molson Coors factored its financial performance in the Spring of 2019 against Mr. George in his 2018 review. Br. of Appellant at 9. This is inaccurate and nonsensical. The email string between Ms. Winter and Mr. Gick on February 28, 2019 establishes that they presented Mr. George's performance review to him on or soon after that date. JA 327-330. Mr. George presents zero evidence that Molson Coors' performance in Spring 2019 was factored against Mr. George in his 2018 review.

enable them to perform their essential job functions. Employees who believe they are disabled and require a job-related accommodation should contact their HR Business Partner.

JA 202-203. Molson Coors prohibits discrimination based on race, color, physical or mental disability, medical condition, and other categories protected under federal, state, and local law. JA 205-208.

Employees with complaints about discrimination or harassment should report the matter to any of the following: (1) their supervisor or the manager of the supervisor; (2) Human Resources; (3) Vice President, Global Ethics & Compliance; (4) Security; or (5) the Company Helpline.  JA 207.

### D.    Mr.    George's    Travel    Restrictions    and    Request    for Accommodation.

In June 2019, Mr. George notified Molson Coors that he needed to extend his medical leave. JA 210-211. Ms. Winter testified that she looked forward to Mr. George coming back to his position and planned to talk to him about how he could be successful on the account. JA 135:12-136:18.

In the fall of 2019, Mr. George notified Molson Coors that his health care providers had instituted several restrictions on his ability to travel. For instance, Mr. George could not travel by airplane and could not drive further than three hours away from Washington Hospital Center until May 2020. JA 63:21-64:6; JA 110.  In addition to the three-hour driving radius, Mr. George had a 10 to 12 hour-per-week

total driving restriction. JA 68:20-69:3. Mr. George also could not travel by train. JA 67:19-22.[8] Mr. George provided documentation informing Molson Coors that these travel restrictions were not expected to be lifted until May 2020. JA 110. As of May 2020, Mr. George still was not permitted to travel by airplane. JA 65:16-18. Mr. George's job description ("Job Profile") states that "[a]pproximately 50-60% travel is associated with this position." JA 111.

In 2019, Ms. Nellans was a Human Resources business partner whose duties included handling accommodation issues under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 (1990). JA 216:16-20. Mr. George spoke with Ms. Nellans and Mr. Sanchez about potential accommodations. JA 78:2-14; JA 79:14-80:3.

On September 18, 2019, Mr. Sanchez, who was Ms. Nellans' supervisor, emailed the ADA packet and Job Profile to Mr. George. JA 107-15.  The packet included a letter describing the process and requested that Mr. George sign the attached Authorization for Release of Health Information and also have his physician sign and return a Request for Medical Information form. *Id.* Mr. Sanchez then asked Ms. Nellans to follow up with Mr. George to continue the ADA process.

---

[8]     Mr. George repeatedly describes these restrictions as "temporary" as if they were very short term; however, he was unable to work in any capacity for at least six months and then had severe travel restrictions for nine additional months. JA 309 ¶ 20; JA 63:21-64:6; 67:19-22; 68:20-69:2; JA 110.

JA 218:17-219:3. Ms. Nellans kept an ADA Accommodation Activity Log where she logged her steps and communications with Mr. George. JA 104-06.

After emailing each other in early October regarding the job profile, Ms. Nellans and Mr. George communicated by email and by telephone regarding his potential return to work. JA 217:6-8.[9]

---

[9]    Mr. George inaccurately claims that Ms. Nellans did not have a single conversation with him regarding open positions at Molson Coors or what positions he could perform there. Br. of Appellant at 12. Mr. George alleged in an affidavit that "I had one call Ms. Nellans [sic], an email exchange." JA 309. This phrasing is unclear but establishes Mr. George did in fact have a telephone call with Ms. Nellans. Mr. George conceded in his deposition that he had conversations with Ms. Nellans and her supervisor Simon Sanchez but does not recall any conversations with them about the specificity of opportunities that existed. JA 79:14-80:3. Although Mr. George claims he never "had an exchange of ideas" with Ms. Nellans (JA 309-10 ¶ 26), whatever that means, the record establishes that such a call occurred, and Mr. George cites no admissible evidence that indicates otherwise. For example, Ms. Nellans's activity log indicates that she and Mr. George had calls on October 18, 2019 discussing "status update and next steps in interactive Discussion" (JA 104), and October 31, 2019 to "go over Employee checklist, accommodations for role" and "to discuss employee checklist Form 9(a)." JA 104, 106. Ms. Nellans also emailed Mr. George on October 4, 2019 "with clarification of job profile after clarifying with Mel," (JA 104). According to the Accommodation Checklist Ms. Nellans completed during her call with Mr. George on 10/31/19, Ms. Nellans and Mr. George discussed the Chain Account Executive position as a possible accommodation. Mr. George indicated that he was "not mobile" because his "daughter [is] in high school." JA 117. On October 22, 2019, Ms. Nellans and Ms. Winter discussed the same Chain Sales Executive position but determined Mr. George was not capable of performing the essential job functions because it required travel outside the medical restrictions. JA 122. Regardless of whether Mr. George and Ms. Nellans discussed the Chain Account Executive position, the relevant undisputed fact is that Molson Coors considered whether Mr. George could perform that position given his travel restrictions and ultimately determined he could not perform the essential functions because they required travel outside of the three-hour radius. JA 122.

In an email to Mr. George dated October 4, 2019, Ms. Nellans followed up on their call that morning and explained the travel requirements for Mr. George's position. JA 116. After verifying the travel estimates with Ms. Winter (his current manager), Ms. Nellans identified six "buckets" in the Job Profile and the estimated travel associated with each bucket. "I have verified these travel estimates with our current manager [Ms. Winter] to ensure we have the best picture of the role." JA 116. Three of the buckets require 60% or greater travel: (1) Sell plan to customer, (2) Customer Stewardship—improve Molson Coors' relationship and alignment with the account, and (3) Execution Management." JA 116.

After reviewing the six buckets and conferring with Ms. Winter, Ms. Nellans informed Mr. George that the estimated travel for his travel is "3-4 days a week, overnight flights included. Minimum of 9 days of travel via flight per month." JA 116. Indeed, these facts are undisputed; Mr. George conceded in his deposition that he traveled by airplane at least 40 to 50% of his working time. JA 60:14-22; JA 63:5-9. Mr. George explained that during these plane trips he would attend "meeting presentations," serve as a beer sommelier at "dinner presentations," attend retail calls and entertainment for "large groups of Buffalo Wild Wings key stakeholders in those territories." JA 61:17-62:4. His areas of responsibility included "Customer Stewardship," in which he was to "improve [Molson Coors'] relationship and alignment with account-60% or greater travel." *Id.* During a telephone call on

13

October 18, 2019, Ms. Nellans explained the ADA process and more specifically, "[t]he request for medical information, what would happen, to see if we could find accommodations, [and] what forms would need to be filled out." JA 220:17-221:12.

On October 22, 2019, Ms. Nellans and Ms. Winter discussed whether Mr. George could perform the essential functions of his position with or without accommodations. JA 165:20-166:8; JA 219:4-10; JA 104. They specifically discussed Mr. George's travel restrictions (JA 224:18-21), and they discussed what was required of his role as a National Account Executive. JA 141:4-9.

During this discussion, they also went through each of Mr. George's territories and customers and discussed how much travel was required for each customer outside of the Washington area. JA 224:18-225:5; JA 225:22-226:5. Ms. Winter and Ms. Nellans also discussed the job duties and responsibilities required for someone servicing the Buffalo Wild Wings account. JA 146:17-147:10.

Ms. Winter sent Ms. Nellans an email following their October 22 discussion explaining Mr. George's call points (names of major customer representatives) for his customer locations, which were all more than a three-hour drive from the Washington area and included New Jersey, Atlanta, Florida, Chicago, South Florida, and New York. JA 123. In this email, Ms. Winter also explained that Buffalo Wild Wing's upcoming conferences were to be held in Las

Vegas, Nevada. *Id.* Ms. Winter concluded, "it is not possible that Mel would be able to perform this job." *Id.*

Ms. Nellans and Mr. George then had a follow-up discussion on October 31, 2019, about the process and next steps, and Ms. Nellans requested input from Mr. George about the duties for which he felt he was qualified and what accommodations he was requesting. JA 222:14-223:13. Mr. George and Ms. Nellans discussed his travel restrictions during this call and in email correspondence. JA 224:11-17; JA 225:2-12. Ms. Nellans completed the Accommodation Checklist as a result of this October 31, 2019 interactive call. JA 121. During this call, Mr. George proposed that he could be a Chain Sales Executive. JA 122. Mr. George and Ms. Nellans discussed Mr. George's belief that "for those [Mr. George] could not get to" he could communicate with customers via "technology" such as "phone, email, Skype." JA 117.

Ms. Nellans wrote on the Accommodation Checklist that Mr. George would not be able to perform the essential job functions of an alternate role--Chain Sales Executive--because "travel within that region would still be outside of geographic area [identified in Mr. George's travel restrictions.] Meetings with large groups @ conventions." JA 122. Mr. George's physicians stated that although he could go to conferences that were within his travel restrictions, "if possible remaining/avoiding large crowds is recommended." JA 110.

On November 6, 2019, Mr. George emailed Ms. Nellans and suggested he could be accommodated by meeting with customers if and when they traveled to the Washington area rather than Mr. George traveling to their locations in the rest of the eastern half of the United States. JA 228:5-19; JA 104; JA 119. Mr. George also requested to make telephone calls and video chats with customers instead of meeting them in person. JA 230:16-231:4.

Ms. Nellans then discussed this request with Ms. Winter. Ms. Winter explained that "it was important for Mr. George to be in market and meeting with his customers in market" because "[t]he essential scope of the role was to be customer facing, to be able to see the on-premise facilities, work directly with folks on site"; in other words, meeting with the customers on site rather than expecting them to come to him. JA 229:19-230:11; 321:5-20.

Mr. George's role required that he call on buyers, retail operations, and any internal or external resources that could influence the execution of his account plan, and it also required that he "visit his customer organizations to identify decision makers and influencers and that he build rapport, trust, and credibility with his customers." JA 240. Performing these duties remotely would have placed Molson Coors at a competitive disadvantage, and Mr. George would have been unable to see how the guests were interacting with the brand and would not have

been able to recreate the full experience of in-person customer interactions. JA 240-241.

In Mr. George's coverage area, Ohio, Michigan, and Indiana accounted for 50% of the account's volume, while Virginia and Maryland accounted for 12%. JA 124. When Ms. Winter covered Mr. George's job duties, she was traveling at least three weeks out of every month to visit executives on a regular basis. JA 143:9-144:11; JA 145:1-5.[10]

Mr. George claims Buffalo Wild Wings contacts visited him when traveling to the Washington area. Br. of Appellant at 5 (citing JA 307, 309 ¶¶ 5-7, 22). He also claims many key Buffalo Wild Wings stakeholders with whom he consistently worked were located within the three-hour radius. JA 309. However, these contentions misstate the record. Mr. George provided only vague information about how many of his contacts traveled to the Washington area and how often they did so. JA 307 ¶¶ 6-7 (listing only seven contacts and stating, "I would visit these stakeholders at their homes, and they would likewise visit me in the Washington, D.C. area."). Also, Mr. George cites his own affidavit for this information, which

---

[10]    Mr. George's argument that Ms. Nellans set and then cancelled three meetings with Mr. George (Br. of Appellant at 13) constitutes a red herring. The record described above conclusively establishes that Mr. George and Ms. Nellans spoke by telephone multiple times and also exchanged emails during the interactive process. Mr. George does not deny that any of the communications described in this ADA Package occurred.

was submitted after he testified in a deposition and admitted that his job required him to travel by airplane to his various contacts at least 40-50% of his working time. JA 60:14-22; JA 63:5-9.

Out of the five Buffalo Wild Wings Regional Vice Presidents in his territory, Mr. George admits that two of them fell outside of the area of his medical restrictions, a third (Paul Caraccioli, whom he lists in his affidavit) was based in Dayton, Ohio, and a fourth was based in Pittsburgh, Pennsylvania. JA 119. In other words, four out of the five were located outside of his three-hour driving radius. Moreover, the undisputed facts establish that 50% of Mr. George's volume on the Buffalo Wild Wings account came from stakeholders located in Ohio, Michigan, and Indiana, while only 12% came from Virginia and Maryland. JA 124. Moreover, as explained above, Ms. Winter sent an email to Ms. Nellans on October 22, 2019, identifying multiple call points for Mr. George's National Account Executive role and explaining that none of them were under a three-hour driving radius. JA 123.

Mr. George attempts to muddy the record by arguing that after his illness, he "was free to continue traveling to his accounts (the same 40-50%) within a three-hour radius and lodging in hotels in that radius." Br. of Appellant at 5. It is clear from his own deposition testimony, however, that he traveled by airplane and therefore outside of a three-hour driving radius, at least 40-50% percent of his working time. JA 60:14-22, 63:5-9.

Mr. George alleges that there were distributor related positions and a chain regional position that he could have performed in the fall of 2019. JA 70:5-12. JA 245.  When he was asked what specific distributor and chain regional positions were open, Mr. George only testified (without support) that during a reorganization, all positions are open. JA 73:9-74:2. Mr. George was unable to identify any specific position that was unfilled in the fall of 2019. JA 76:11-16.[11]

Additionally, Mr. George admitted that the distributor positions to which he was referring would require him to drive (or ride in a car as a passenger) all day to various retail establishments even though he had a 10-12 hour total weekly driving restriction. JA 71:8-72:3. Mr. George believes the regional chain job which covered chains regionally was open; however, this job required traveling to Virginia Beach, which is beyond Mr. George's three-hour driving restriction.  JA 91:13-19; JA 92:5-10.

---

[11]    Mr. George claims Mr. Gick told Ms. Nellans in August 2019 "that there were 'enough open roles' to accommodate Mr. George." Br. of Appellant at 14.  Mr. Gick did not make this statement, and the citations Mr. George gives for this proposition do not support his argument. Notably, Mr. Gick wrote this email prior to Mr. George notifying Ms. Nellans of his severe travel restrictions.  Also, page 32 of Ms. Nellan's deposition discusses how Ms. Nellans had a phone call with Mr. George getting "input from him on what he felt he was qualified for, getting detailed information from him." JA 223:3-13.  The citation to the August 26, 2019 email from Mr. Gick demonstrates that he was making a general statement about open roles, whether a string of developmental assignments could cover multiple roles and whether Mr. George was guaranteed the same role after he had exhausted his FMLA leave more than three months earlier. JA 332.

Mr. George did not submit an application for the positions he claims he could have performed and could not recall if he saw any open positions published on Molson Coors' website in the fall of 2019. JA 72:4-11; JA 74:3-75:7. Mr. George conveyed to Molson Coors that he could not relocate outside of the Washington area because of medical restrictions and also because he had a daughter in high school there. JA 80:13-81:4.

Once Ms. Nellans completed her process, an "ADA Committee" at Molson Coors met to review the steps that were taken in the accommodation process. JA 227:11-19; JA 232:9-16. Ms. Nellans attended this meeting, along with in-house counsel and a representative from occupational health. *Id.* Once the process was completed, Ms. Nellans determined that no accommodation could be provided. JA 233:8-14.

Molson Coors' short term disability policy states that termination occurs after exhaustion of short-term disability if the employee is unable to return to work with or without a reasonable accommodation. JA 233:8-14; JA 250-255. Ms. Nellans made Mr. Sanchez aware of the outcome, and she also discussed with Mr. Gick the close of the ADA accommodation process, the exhaustion of Mr. George's short-term disability benefits and leave, and next steps. JA 234:6-22. Mr. Gick was not

involved in the ADA process itself, what jobs Mr. George could do, or what jobs could be offered to him.  JA 165-66.

Mr. George's employment was terminated on November 25, 2019. JA 102. After Mr. George was terminated, Adam Bradberry replaced him. JA 166:18-20; JA 167:5-7. Mr. George never applied for any open or available positions in the National Accounts/Sales Department.  JA 239-240. Even if he had, all but two required him to relocate, which he was unwilling to do. *Id.* The other two positions, Revenue Management/Business Analyst and National Account Executive – eCommerce, required a different area of expertise than Mr. George's skill set. *Id.*

## E.    Mr. George's Allegations of Disability Discrimination Under the D.C. Human Rights Act.

Mr. George alleges that his disability is a "heart transplant."  JA 50:13-17. In his submission to Prudential on September 22, 2020, the administrator of his long-term disability benefits, Mr. George indicated that he was unable to return to work to his own job or to an alternate job with Molson Coors. JA 270.  Making statements to the Social Security Administration or a long-term disability insurer that an employee cannot perform the essential functions of their job even with accommodation could bar the employee from asserting, for ADA purposes, that accommodation would have allowed them to perform their job. *See, e.g., Swanks v. Washington Metro. Area Transit Auth.*, 116 F.3d 582, 587 (D.C. Cir. 1997).

In response to the question asking what facts he has to support his claim

of disability discrimination, Mr. George responded:

> So I was terminated, having, you know, been in good standing with the company until I got ill. And then during that disability, during that time of me going through my heart transplant and my illness, which has all been communicated and shared with all the key stakeholders, I was terminated.

JA 51:2-52:18.

### F.    Mr. George's Allegations of Retaliation in Violation of the FMLA.

During his deposition, Mr. George was unable to provide any specific facts

in support of his FMLA claim.

> Q.    Okay. And what – are you aware of any facts that Molson Coors retaliated against you for taking FMLA leave?
>
> A.    My termination.
>
> Q.    Other than the termination – the termination of your employment, are you aware of any other facts as you sit here today and testify that support that Molson Coors retaliated against you for taking FMLA leave?
>
> A.    Not that I can recall, but that's the primary response that I have for you today.

JA 55:2-12.

## SUMMARY OF ARGUMENT

### Count One of the Amended Complaint.

The District Court properly granted Molson Coors's Motion for Summary

Judgment on Mr. George's disability discrimination claim under the District of

Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 et seq. as the Record contains no genuinely disputed material facts from which a reasonable juror could conclude Molson Coors failed to engage in a sufficient interactive dialogue with Mr. George.  Mr. George's case rests entirely upon nothing more than his own unsubstantiated opinions and beliefs; none of which the District Court could consider under multiple cases beginning with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Mr. George repeatedly mischaracterizes the Record and ignores evidence he does not like.  His claim that the District Court either ignored or downplayed evidence is incorrect.  As detailed below, the District Court properly engaged in a careful analysis of the actual Record testimony.  The undisputed Record evidence establishes that extensive travel was an essential function of Mr. George's job as a National Account Executive for the Buffalo Wild Wings account. Thus, he could not perform this essential function by communicating solely through electronic and online platforms for a period of more than six months, a request that would have put Molson Coors at a distinct competitive disadvantage.  Courts regularly hold that an employer need not reassign an essential job function to another employee or hire two people to perform one position.  *Floyd v. Lee*, 85 F. Supp. 3d 482, 510 (D.D.C. 2015).

Moreover, the Record establishes that no other positions were vacant in the Washington area that could accommodate Mr. George's travel restrictions.  When Mr. George's argument is stripped of his inadmissible and self-serving opinions, the

undisputed material facts establish that Molson Coors engaged in a robust interactive dialogue with Mr. George, satisfied its obligation under a failure to accommodate claim, and did not engage in any conduct that would allow a reasonable jury to conclude that it intentionally avoided its obligations under the DCHRA.

### **Count Three of the Amended Complaint.**

The District Court properly granted Molson Coors' Motion for Summary Judgment on Mr. George's retaliation claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., because Mr. George exhausted his FMLA leave six months before his eventual termination and no evidence of pretext exists. Moreover, Mr. Gick, Mr. George's supervisor for a three-month period in late 2018/early 2019, was not involved in the Molson Coors disability accommodation process or in the eventual decision to terminate Mr. George. For these reasons, and as fully demonstrated below, the District Court properly granted Molson Coors's Motion for Summary Judgment and correctly dismissed Mr. George's claims.

## **ARGUMENT**

### **I.    STANDARD OF REVIEW**

This Court reviews a district court's grant of summary judgment under the de novo standard. *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 392 (D.C. Cir. 2020) (citing *Minter v. District of Columbia*, 809 F.3d 66, 68 (D.C. Cir. 2015)). Summary judgment is appropriate if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The

movant bears the initial burden of identifying parts of the record showing the lack

of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). Once the movant satisfies its initial burden, the other party must "designate

specific facts showing that there is a genuine issue for trial." *Id.* at 324. A party

cannot depend on unsupported allegations. *See* Fed. R. Civ. P. 56(c). Moreover, a

"mere . . . scintilla of evidence in support of" the nonmovant's position cannot defeat

a motion for summary judgment. *Anderson*, 477 U.S. at 252.

## II.    THE DISTRICT COURT PROPERLY DISMISSED MR. GEORGE'S DISABILITY DISCRIMINATION CLAIM IN COUNT I.

As explained below, Mr. George failed to establish any material, undisputed

facts from which a reasonable jury could find that Molson Coors discriminated

against him because of his disability or failed to accommodate his disability. "When

evaluating claims brought under the DCHRA, decisions construing the ADA [are

considered] persuasive." *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5

(D.C. Cir. 2015) (quotation marks omitted). Moreover, "claims arising under the

[DCHRA] are analyzed in the same manner as an ADA claim." *Giles v. Transit

Emps. Credit Union*, 32 F. Supp. 3d 66, 70 (D.D.C. 2014), *aff'd*, 794 F.3d 1 (D.C.

Cir. 2015).

25

### A.   Molson Coors Did Not Illegally Fail to Provide Mr. George with a Reasonable Accommodation.

In this case, Mr. George has no direct evidence of intentional discrimination. Thus, courts follow the three-part test outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). First, a plaintiff must establish a prima facie case of discrimination under the ADA by showing that he: (1) had a disability; (2) was qualified for the position with or without a reasonable accommodation; and (3) suffered an adverse employment action because of the disability. *Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929, 933–34 (D.C. Cir. 1999). Then, the employer must articulate a "legitimate non-discriminatory reason for its action," leaving the plaintiff an opportunity to prove that the employer's proffered justification was not the true reason, but a pretext for discrimination. *Id.* (*citing Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir.1998) (en banc)).

Once the employer establishes a legitimate, nondiscriminatory reason, the court must determine whether the employee has produced enough evidence for a reasonable jury to find that the employer's explanation was not legitimate and discrimination was the real reason. *See Brady v. Off. of Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008*).* "Of course, consideration of this question requires [the court] to evaluate all of the evidence before [it], including the same evidence that the plaintiff would use to establish h[is] prima facie case." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).

Mr. George appears to rely on two principal arguments in his appeal of the dismissal of his failure to accommodate claim.  First, he argues that travel was not an essential function of his job as a National Account Executive.  Second, he contends that Molson Coors should have transferred him to the Chain Sales Executive position, which he claims was vacant.  Molson Coors will address each argument in turn.

> 1.   The undisputed facts establish that travel beyond a three-hour driving radius of Washington Hospital Center was an essential function of the National Account Executive position.

Section 12111(8) defines an "qualified individual" as someone who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Under the ADA, courts defer "to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8); *see also Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 14 (D.D.C. 2000).  "In determining the 'essential functions' of a job, 'consideration shall be given to the employer's judgment as to what functions of a job are essential.'" *Doak v. Johnson*, 798 F.3d 1096, 1098 (D.C. Cir. 2015) (quoting 42 U.S.C. § 12111(8)).

Mr. George was not qualified for his role as National Account Executive because he could not meet the travel requirements; this constitutes a flaw in his prima facie case.  *See Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014) (holding an

employee is not "qualified" for a role if they do not meet all of the requirements).

Mr. George was the National Account Executive for the Buffalo Wild Wings

account, and his territory covered the entire eastern half of the United States (from

the Mississippi River east from Maine to Florida).  JA 37:16-38:4. Molson Coors

offered extensive evidence explaining the significant travel requirements inherent in

Mr. George's position and how these requirements constituted an essential function

of his job.  The job description establishes that travel constituted more than 50% of

his working time. JA 111.  Also, Mr. George admitted that travel was "a big part of

the position" and forced him to travel by airplane at least 40-50% of his working

time.  JA 38:8-12; JA 39:14-22; 42:5-9. Mr. George often traveled to participate in

meeting presentations, dinner presentations, call on retail customers, and provide

entertainment for large groups of key customer stakeholders. JA 40:17-41:7. This

Court should give "substantial weight" to Molson Coors about travel as an essential

function of Mr. George's job.  *See Hunt v. District of Columbia*, 66 A.3d 987, 990

(D.C. 2013).[12]

---

[12]    The District Court properly noted that half of the volume of Molson Coors products in Mr. George's region originated in Ohio, Michigan and Indiana and took judicial notice of their driving times from Washington along with the travel time for Mr. George's major customers. Mem. Op. at 10.  A court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). FRE 201(b), therefore, allows the Court to take judicial notice of facts such as geographical distance, as the District Court did here. *See, e.g., Louis*

Mr. George heavily relies on *Solomon v. Vilsack* for the proposition that "[b]ecause of the advance of technology in the employment context, attendance at the workplace can no longer be assumed to mean attendance at the employer's physical location." 763 F.3d 1, 10 (D.C. Cir. 2014). However, the *Solomon* case substantially differs from the case at bar. This Court in *Solomon* merely held that flexible work hours in certain factual circumstances can constitute a reasonable accommodation. In that case, the plaintiff, a senior budget analyst, had depression and sometimes worked unusual hours to fulfill her full-time schedule. *Id.* at 6. She never once missed a deadline or had anyone complain about her work performance. *Id*. The defendant in that case, the United States Department of Agriculture, also allowed another, non-disabled budget analyst to work a flexible schedule, and plaintiff and her coworker often worked late together before the Department stopped allowing plaintiff to work past 6:00 p.m. *Id.* Based on this factual record, this Court held that a flexible work schedule does not constitute an unreasonable accommodation in all cases. *Id.* at 10.

Assuming, *arguendo*, working remotely could be a reasonable accommodation in certain circumstances, the undisputed facts in the record establish that it was not a reasonable accommodation for Mr. George's position. Molson

---

*v. Hagel*, 177 F. Supp. 3d 401, 404 n.4 (D.D.C. 2016) (taking judicial notice of locations and geographical distances in venue challenge).

Coors accommodated Mr. George under the DCHRA by allowing him to remain on leave through the summer and fall of 2019, after his FMLA leave had expired in May 2019.  In the fall of 2019, Mr. George's medical provider placed major restrictions on Mr. George's ability to travel, and these restrictions were in place until at least May 2020.  JA 110.  These extensive restrictions included: (1) no travel beyond a three-hour radius of Washington Hospital Center; (2) no travel by airplane or train; (3) avoiding large crowds; and (4) a total driving restriction of 10 to 12 hours per week. JA 67:19-22; JA 68:20-69:2; JA 110.

Allowing Mr. George to work remotely through Skype or email rather than visiting his territories in person would have placed Molson Coors at a distinct disadvantage with its competitors.  JA 240-41; JA 350.  Ms. Winter, who was promoted to the supervisor over both Buffalo Wild Wings National Account Executive positions in early 2019 and covered Mr. George's territory in his absence, testified she traveled "at least three weeks out of the month, because you're rotating between seeing all these people.  And you can see the territories." JA 144:3-11.  Ms. Nellans also testified that this role required seeing the five Buffalo Wild Wings Regional Vice Presidents on a regular basis.  JA 143:14-144:2. Where it is undisputed that the plaintiff's presence was often required to perform a function and the plaintiff provides nothing "[b]eyond the vague, conclusory, and unsupported assertions . . . that [he] could perform [his] job if allowed to work off-site . . . ., the

evidence points in only one direction: that it was essential to [his] job that [he] be physically present on-site." *Mack v. Georgetown Univ.*, No. 15-CV-793 (RMC/GMH), 2017 WL 4325596, at *14 (D.D.C. Aug. 4, 2017), *report and recommendation adopted*, No. CV 15-793 (RMC), 2017 WL 4325617 (D.D.C. Sept. 27, 2017), *aff'd*, No. 17-7139, 2018 WL 3156846 (D.C. Cir. May 24, 2018). Mr. George offers nothing more than speculation that he could perform 100% of his position remotely.

In his deposition, Mr. George admitted his job required at least 40-50% travel, but he attached an affidavit to his summary judgment opposition conflicting with that testimony and claiming that the customer stakeholders could travel to him or that he could work using technology. A party cannot create a genuine issue of material fact by filing a self-serving affidavit that contradicts previous deposition testimony. *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991). Thus, a court may, and should, disregard an affidavit that contradicts sworn testimony. *See Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) ("Virtually every circuit has adopted a form of the so-called 'sham affidavit rule.'").

Mr. George quotes the District Court and alleges that a jury should determine the essential functions of a job. Brief of Appellant at 32 ("To be sure, determination of essential functions is typically in the jury's province."). Plaintiff omits the remainder of the quote from the District Court—"but without a material dispute on

the matter, a court can make the requisite finding." JA 403. There was no material dispute as to essentiality of travel to the National Account Executive position. As the District Court noted, Mr. George himself recognized the essentiality of extensive travel in an email he wrote in which he recognized the expected minimum 60% travel requirement for the position. JA 402.[13]

> ### 2. The Undisputed Facts Establish that Molson Coors Engaged in a Robust and Legally Sufficient Interactive Accommodation Process.

Mr. George argues that Molson Coors' accommodation process was deficient because Mr. George and Ms. Nellans only had one phone call; however, the record establishes that Mr. George and Ms. Nellans communicated on multiple occasions both by telephone and email in October and November 2019.  For example, after she received Mr. George's job restrictions from his health care provider, Ms. Nellans

---

[13] Mr. George mischaracterizes the cases he cites in support of this contention. Br. of Appellant at 32, n. 19. Notably, the first case found that the parties had previously stipulated to the essential function at issue and denied the plaintiff's argument that their employer had waived the essential function as a requirement. *Hancock v. Washington Hosp. Ctr.*, 13 F. Supp. 3d 1, 6 (D.D.C. 2014), *aff'd*, 618 F. App'x 4 (D.C. Cir. 2015) (citing *Phelps v. Optima Health, Inc.*, 251 F.3d 21 (1st Cir. 2001)) ("even when an employer and employee have made arrangements to account for the employee's disability—a court must evaluate the essential functions of the job without considering the effect of the special arrangements"). The second case citation from Mr. George, again, omits the entire quote from the court. Br. of Appellant at 32, n. 18. The full quote from the court states: "[T]he determination of whether physical qualifications are essential functions of a job requires the court to engage in a highly fact-specific inquiry." *Dougherty v. CNN*, 396 F. Supp. 3d 84, 97 (D.D.C. 2019). The court in *Dougherty* was discussing the essentiality of physical qualifications for a job—not a requirement to travel extensively.

recapped a telephone conversation she had with Mr. George on October 4, 2019. Her email contains the opening line, "Thank you for your time this morning.  I have recapped our conversation highlights below."  JA 116.  Ms. Nellans also had calls with Mr. George on October 18 and October 31, and Mr. George followed up by email on November 6.  JA 104.  Ms. Nellans and Ms. Winter also discussed Mr. George's restrictions and job requirements by phone and email on October 22.  JA 104.  Ms. Nellans also created an "ADA Accommodation Activity Log" with notes (JA 104-06), and completed the "Accommodation Checklists" for the Company (JA 121-22) and the Employee (JA 117-18).  Finally, Ms. Nellans met with the ADA Committee, comprised of representatives from Legal, Human Resources, and Occupational Health, to ensure the Company's process had been followed.  JA 227:11-19.  This multiple-step process of emails, discussions, telephone calls and notes, which are more fully detailed in the ADA package Ms. Nellans developed during the interactive process (JA 104-125), establish that Molson Coors engaged in a robust interactive process where both parties participated in good faith.  *See Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (describing the interactive process as a "flexible give and take").

Mr. George argues that Ms. Nellans and Ms. Winter did not discuss with Mr. George "possible temporary accommodations that would have enabled him to perform his job or a comparable job at Molson Coors."  Br. of Appellant at 15.

This contention is wildly inaccurate. During their telephone call on October 31, 2019, as made clear in the Accommodation Checklist notes, Mr. George and Ms. Nellans discussed his belief that "for those [customers Mr. George] could not get to" he could communicate with customers via "technology" such as "phone, email, Skype."    JA 117. Ms. Winter stated that competitors were visiting the restaurants/stakeholders and for Mr. George not being able to do so for such an extended period of time would have put Molson Coors at a competitive disadvantage.  JA 240-41; JA 350.  Mr. George argues that he could have met the customer stakeholders in the Washington area; however, this argument is based purely on speculation and presupposes, vaguely and without evidence, that the stakeholders -- his customers -- were willing to travel to him.  Br. of Appellant at 18-19.  Mr. George denies the competitive disadvantage placed on Molson Coors that would have resulted from Mr. George working remotely, citing unnamed customers that may have visited Washington with whom he could have met in person.  The possibility that Mr. George may be able to elicit testimony at trial that would cause the jury to question whether Mr. George could have met with customers as they visited the Washington area is not enough to stave off summary judgment. *See Jenkins v. D.C.*, 223 A.3d 884 (D.C. 2020) (citing *Roche v. John Hancock Mutual Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir. 1996) ("speculation and surmise . . . are impuissant in the face of a properly documented summary judgment motion"));

34

*see also Brown v. Brody*, 199 F.3d 446, 459 (D.C. Cir. 1999) ("mere speculations" are insufficient to create a genuine issue of fact).

Mr. George incorrectly argues that Molson Coors failed to follow its own policy on ADA accommodation requests. The policy merely states that Human Resources should "identify whether any known accommodations not identified by the employee are available." JA 462. The record establishes that Ms. Nellans and Mr. George discussed his specific accommodation requests of communicating with stakeholders by email and Skype and by having the customers travel to him. JA 117. The record also establishes that Ms. Nellans and Ms. Winter discussed this request and ultimately rejected it because they reasonably determined that travel was an essential function of the position. JA 122. The employer is not required to identify a reasonable accommodation if one does not exist, and the policy does not require otherwise. Once Mr. George was not a qualified individual, the employer's obligation to continue the interactive process ends. *See Minter v. District of Columbia*, 809 F.3d 66, 70 (2015) (granting summary judgment with no discussion of the interactive process when the court determined the plaintiff was not a qualified individual under the statute).

**B.    The Only Vacant Position in the Washington Area Also Required Travel Beyond a Three-Hour Radius as an Essential Function, and Zero Evidence Exists Showing Molson Coors Intentionally Avoided its Obligations Under the DCHRA.**

Mr. George contends that Molson Coors discriminated against him and intentionally avoided its obligations under the DCHRA by not accommodating his travel restrictions in his current position (as explained above) and by not reassigning him to a vacant position.  Zero evidence exists that anyone at Molson Coors harbored any discriminatory animus against him because of his alleged disability. In fact, the undisputed record evidence establishes that Molson Coors accommodated Mr. George's health problems from 2018 onward, and kept his job open for him for nine months despite challenges with customer coverage.  JA 192; JA 194-196; JA 198-200.

An employee seeking reassignment to a vacant position is "otherwise qualified" if, with or without reasonable accommodation, he can perform the essential functions of the employment position to which he seeks reassignment. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998). The concept of a reasonable accommodation does not require an employer to "restructure an existing job to remove some of its essential functions." *Saunders v. Galliher & Huguely Assocs., Inc.*, 741 F. Supp. 2d 245, 249 (D.D.C. 2010) (citing *Jones v. University of the Dist. of Columbia*, 505 F. Supp. 2d 78, 90 (D.D.C. 2007)).  Here, Mr. George alleges that he should have been transferred to the Chain Sales Executive position.

Molson Coors identified extensive travel as an essential function of this position because it required Mr. George to travel to Virginia Beach, which was outside of his three-hour radius, and required him to attend meetings with large groups at conventions. JA 122. The District Court properly concluded that extensive travel was essential, stated that the evidence supported this conclusion. JA 402.

Although Mr. George appears to argue that he could have handled the position if the Virginia Beach area was excluded, this would require Molson Coors to reassign an essential job function or hire a second employee to cover this territory. The DCHRA does not require Molson Coors to hire another employee to perform this essential function or to reassign essential functions. *See Floyd v. Lee*, 85 F. Supp. 3d 482, 510 (D.D.C. 2015); *see also Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (finding "unreasonable" an accommodation that would "requir[e] another person to perform an essential function" of the disabled employee's job); *Saunders v. Galliher & Huguely Assocs., Inc.*, 741 F. Supp. 2d 245, 249 (D.D.C. 2010) (citing *Jones v. University of the Dist. of Columbia*, 505 F. Supp. 2d 78, 90 (D.D.C. 2007) (the concept of a reasonable accommodation does not require an employer to "restructure an existing job to remove some of its essential functions.").

Molson Coors did not fail to accommodate Mr. George or intentionally refuse to accommodate him in violation of the DCHRA. The undisputed facts show that no positions were available for which Mr. George was qualified in the September

2019 time frame. Mr. George was unable to relocate away from Washington Hospital Center and further refused to do so because he had a child in high school. JA 80:13-81:4. There were no open positions within the Washington area for which Mr. George was qualified and which did not require travel beyond a three-hour radius. JA 373 ¶ 13. In the *Aka* case, which Mr. George cites but actually supports Molson Coors' position, the D.C. Circuit made clear that "[a]n employee need not be reassigned if no vacant position exists." *Aka*, 156 F.3d at 1305.

Mr. George cites *Aka* for the proposition that reassignment to a vacant position is a reasonable accommodation under the ADA and "some active effort on the part of the employer" to reassign is required. Br. of Appellant at 36 (citing 156 F.3d at 1304). Mr. George's citation is incomplete and misleading. *Aka* explains the burden is on the *employee* to show some vacant position to which the employer could reassign him. *Id.* at 1304 n.27.[14]

---

[14]    Also, *Aka* is factually distinguishable from the instant case because a collective bargaining agreement governed reassignment of positions like the one the plaintiff was seeking. This Court declined "to decide the precise contours of an employer's reassignment obligations" and remanded the case so the district court could determine: (1) whether on the facts of this case Washington Hospital Center had an obligation under the ADA to reassign Aka to a vacant position, and (2) if so, whether reassigning the plaintiff to the vacant position violated the collective bargaining agreement. *Aka*, 156 F.3d at 1303, 1305-06. In any case, this Court made clear in *Aka* that "the ADA does not require that a disabled employee be reassigned to a position for which he is not otherwise qualified, *see* 42 U.S.C. § 12112(b)(5)(A), or if reassignment would be an undue hardship on the operation of the business of the employer." *Id.* Likewise, an employer is not required to create a new position. *Id.*

Moreover, Molson Coors did engage in "some active effort" thereby satisfying *Aka*.  156 F.3d at 1304.  Ms. Nellans completed the "Accommodation Checklist" (the Employer form) on or about October 22, 2019, and discussed potential accommodations with Ms. Winter.   JA 121.   The Accommodation Checklist shows that Mr. George proposed reassignment to Chain Sales Executive.  JA 122.  Ms. Nellans determined that this position was available and Mr. George possessed the requisite education, skills and experience for the position; however, she determined that the Mr. George was not capable of performing the essential job functions of the position because "[t]ravel within that region would still be outside of [the] geographic area [and Mr. George could not attend] meetings w/ large groups @ conventions."  JA 122.

Notably, if the employee provides information demonstrating that he cannot perform the essential functions of a job, the employer is entitled to terminate the interactive process and has no further obligation under the ADA. *See Minter*, 809 F.3d at 69-70 (where, based on a letter from her doctor, plaintiff was "indisputably" not qualified as of the date she made the accommodation request, employer could not be liable for denying her request); *see also Dogmanits v. Capital Blue Cross*, 413 F. Supp. 2d 452, 461 (E.D. Pa. 2005) (once plaintiff's doctor indicated that plaintiff could not return to work, employer was entitled to terminate her). Thus,

once Molson Coors established that Mr. George could not perform the essential functions of his position, it had no further obligations under the DCHRA.

Mr. George argues that pretext exists because he should have been offered two other roles, which will be addressed in turn. First, he argues he should have been offered the Regional Chain position that Reilly Madison vacated (Br. of Appellant at 20); however, Mr. Madison left his position in July 2019, while Mr. George was still on Short Term Disability leave and was unable to return to work. JA 355:19- 356:14. This position was filled prior to September 2019, at a time when Mr. George was still on disability leave. JA 350; JA 194-96. Contrary to Mr. George's contention, there is no evidence that Mr. Madison's position was open while Mr. George and Molson Coors were discussing accommodations for his return to work.

Second, Mr. George argues that there were open distributor-related positions in the fall of 2019 (Br. of Appellant at 19); however, he failed to identify, either at his deposition or elsewhere, that any region chain or distributor jobs were open in September 2019 for which he was qualified. He tentatively identified one regional chain job for the Washington area "If I have the timing correct"; however, he admitted that job required travel to Virginia Beach, which was four hours from Washington, and by definition outside of his driving restrictions during the fall of 2019. JA 91:4-92:10. According to Ms. Winter, there were no open positions as a

result of the 2019 reorganization for which Mr. George was qualified and which did not require him to travel beyond his three-hour driving restriction or his relocation limitation. JA 373 ¶ 13.[15]

In summary, Mr. George could not perform the essential job functions of his current positions or the vacant positions available in the Washington area in the fall of 2019. Thus, he was not qualified for either role and Molson Coors properly terminated him. Turning then to the "central inquiry" under *Adeyemi*, Mr. George did not produce "sufficient evidence for a reasonable jury to find that [Molson Coors'] asserted non-discriminatory reason was not the actual reason and that [Molson Coors] intentionally discriminated against [Mr. George]." *Adeyemi*, 525 F.3d at 1226. No evidence exists of pretext or that Molson Coors intentionally avoided its obligations under the DCHRA. Thus, summary judgment is proper in this case. *See Minter*, 809 F.3d at 70.

## III. THE COURT SHOULD AFFIRM THE DISMISSAL OF MR. GEORGE'S FMLA RETALIATION CLAIM.

Mr. George's FMLA retaliation claim suffers multiple fatal flaws. First, Mr. George has failed to establish a prima facie case of FMLA retaliation. To establish a prima facie case of FMLA retaliation "an employee may . . . show[] (1) that he

---

[15]    Mr. George's contention that all roles are open during a reorganization is based on nothing but pure speculation, and speculation cannot be used to defeat summary judgment. *Atanus v. Sebelius*, 652 F. Supp. 2d 4, 10 (D.D.C. 2009), *aff'd*, No. 09-5387, 2010 WL 1255937 (D.C. Cir. Mar. 2, 2010).

exercised rights afforded by the FMLA, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the exercise of his rights and the adverse employment action." *Roseboro v. Billington*, 606 F. Supp. 2d 104, 109 (D.D.C. 2009) (internal quotation marks omitted). In the instant case, Mr. George has failed to make a showing that there was a causal connection between the exercise of his rights afforded by the FMLA and his termination. Without this showing Mr. George has failed to establish a prima facie case of FMLA retaliation. In *Alford v. Providence Hosp.*, 945 F. Supp. 2d 98 (D.D.C 2013), *aff'd*, 561 F. App'x 13 (D.C. Cir. 2014), a case similar to the case currently before this Court, the court found that the plaintiff failed to establish a prima facie case of FMLA retaliation because she failed to show a causal connection between her taking FMLA leave and her subsequent termination nine months after her FMLA leave terminated. *Id.* at 108. "Due to the nine-month passage of time, [the plaintiff] has not shown a causal connection between the exercise of her FMLA . . . rights and her termination." *Id.*

Similarly, here, Mr. George took FMLA leave on February 23, 2019, and exhausted this leave on May 19, 2019. JA 46-100, JA 192. His subsequent termination occurred on November 25, 2019, more than nine months after he initially took FMLA leave and six months after he exhausted his leave. JA 102. This is not sufficiently close in time to support a finding that the protected conduct and the subsequent termination were causally connected.

Second, even assuming *arguendo* that Mr. George had established a prima face case of FMLA retaliation, the District Court properly granted summary judgment because Mr. George has failed to establish that Molson Coors' proffered reason for his termination was pretextual. In analyzing FMLA retaliation claims, "'courts apply the burden-shifting framework adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973).'" *Thomas v. D.C.*, 227 F. Supp. 3d 88, 99 (D.D.C. 2016) (quoting *Roseboro*, 606 F. Supp. 2d at 109). If the plaintiff makes a showing of a prima facie case of retaliation, which Mr. George has not done, "the employer may overcome the presumption of retaliation by producing evidence of a legitimate, non-discriminatory reason for its action." *Roseboro*, 606 F. Supp. 2d at 109. In the case at bar, Molson Coors has produced overwhelming evidence that Mr. George's termination was for a legitimate, non-discriminatory reason. Once, as here, the employer has made a showing of a legitimate, non-discriminatory reason for termination, "the 'central question' at summary judgment becomes whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted . . . nonretaliatory reason was not the actual reason and that the employer intentionally . . . retaliated against the employee.'" *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)).

In his brief, Mr. George relies on two emails and the 2018 Performance Review in an attempt to show that Molson Coors' stated reason for his termination was pretextual. However, this material simply is not sufficient evidence for a reasonable jury to make such a finding.

The first email that Mr. George identifies was written in April 2019, seven months before Molson Coors terminated his employment. In this email, Mr. George's supervisor, Mr. Gick, seeks the counsel of Molson Coors' Human Resources department, asking "how long can [Mr. George] stay out on leave without giving up his role? We have been without him for close to six months now and it is putting a considerable strain on the team and impacting our performance." JA 358. Nothing in this email could be considered by a reasonable jury as evidence of a pretextual purpose for Mr. George's termination, which occurred seven months later. Instead, the email reveals an attempt by a supervisor to determine the company's responsibilities under company policy and the pertinent laws.

The second email that Mr. George relies upon was sent by Mr. Gick on August 26, 2019, more than three months after Mr. George exhausted his FMLA leave. In this email, Mr. Gick relays his belief that the FMLA no longer guarantees Mr. George's ability to return to his prior role and is discussing the possibility of temporary "developmental assignments" as a way to cover Mr. George's job duties while he is still on leave (although no longer FMLA-protected leave) and asks for

"creative ideas."  JA 387-390. Mr. Gick questions the plan of having a "string of developmental assignments" and states, "Mel is not guaranteed the same role if he comes back if I read the terms of the FMLA correctly."  JA 387.  Contrary to Mr. George's argument, this statement is not in contravention to Mr. George's FMLA rights. Instead, it is a correct statement of the law. The FMLA does *not* guarantee an employee's position once his FMLA leave is exhausted. *See Alford*, 945 F. Supp. 2d at 105 (noting that the FMLA does "not provide a guarantee that employment will continue if the unpaid leave expires and the employee is still unable to return to work).  Instead, "[a]n employee who exceeds the permitted FMLA leave time has no right to be restored to his or her job." *Id*.  Mr. Gick's factual statement concerning the state of the law cannot constitute evidence of a pretextual termination.

Even if Mr. Gick's emails could constitute animus related to Mr. George's FMLA rights, which they cannot, Mr. Gick testified that he was not involved in the ADA process for Mr. George and was not involved in any decision on what jobs he could perform.  JA 165-66.  Ms. Nellans testified that she made the decision to terminate Mr. George after the ADA process completed and decided that there was no reasonable accommodation available.  JA 233:2-14.  Pretext cannot exist when the person who made the inappropriate comments "was not the person who made the employment decision[] that adversely affected plaintiff." *Khan v. Holder*, 37 F. Supp. 3d 213, 230 (D.D.C. 2014); *see also Nurriddin v. Goldin*, 382 F. Supp. 2d 79,

99 (D.D.C. 2005) (requiring, in the Title VII context, a nexus between the animus and the adverse employment decision), *aff'd*, *Nurriddin v. Griffin*, 222 F. App'x. 5 (D.C. Cir. 2007).

Finally, Mr. George relies on his 2018 performance review, which addressed his performance *before* he began his FMLA leave. This reliance is also misplaced. First, Molson Coors neither relied upon this performance review nor referenced it in making its termination decision.[16] Further, this performance review was not unsupported, as Mr. George argues, but was, instead, fully supported by neutral metrics, feedback from customers, and direct observations. JA 164:7-11; JA 323:20-324:11; JA 327; JA 426-35. Simply put, a reasonable jury could not conclude that this performance review had any connection to Mr. George's eventual termination or is evidence of a pretextual purpose for FMLA retaliation. Consequently, no evidence exists upon which a reasonable jury could rely to conclude Molson Coors's proffered reason for Mr. George's termination was pretextual, the claim for FMLA retaliation fails as a matter of law.

---

[16]    Moreover, the performance evaluation was completed nine months before Mr. George was terminated, and Mr. George was terminated six months after his FMLA leave expired; both instances are too remote in time to support an inference of causation. *See Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (finding no inference of causation where the events were two and one-half months apart).

## <u>CONCLUSION</u>

Molson Coors complied with its legal responsibilities by granting Mr. George many months of medical leave, in fact, six more months than to which he was entitled under the FMLA.  When Mr. George's health care providers cleared him to return to work, it was with significant travel restrictions that were fundamentally at odds with the essential functions of his National Account Executive position and the Chain Sale position he requested as an accommodation.  Mr. George has put forth no evidence that Molson Coors discriminated or retaliated against him in his performance review or in the decision to terminate him.  The District Court properly granted summary judgment, and this Court should affirm that decision.

Respectfully submitted, December 2, 2022,

*/s/ Hans P. Riede*
Hans P. Riede
Sarah A. Belger
QUARLES & BRADY LLP
1701 Pennsylvania Avenue, NW, Suite 700
Washington, D.C. 20006
202-372-9600
hans.riede@quarles.com
sarah.belger@quarles.com
Counsel for Appellee
Molson Coors Beverage Company USA, LLC

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

1.    This Brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2.    Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, this Brief contains <u>11,994</u> words.

3.    I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.


*/s/ Hans P. Riede*
Hans P. Riede
QUARLES & BRADY LLP

## CERTIFICATE OF SERVICE

I certify that, on December 2, 2022, I electronically filed the foregoing Opening Brief of Appellant with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Hans P. Riede
Hans P. Riede
QUARLES & BRADY LLP

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Page

RELEVANT PROVISIONS OF THE
   DISTRICT OF COLUMBIA HUMAN RIGHTS ACT

     D.C. Code § 2-1401.01 ................................................................. Add. 1

RELEVANT PROVISIONS OF THE AMERICANS
   WITH DISABILITES ACT

     42 U.S.C. § 12101.................................................................... Add. 2
     42 U.S.C. § 12111(8).............................................................. Add. 4
     42 U.S.C. § 12112(b)(5)(A).................................................... Add. 4

RELEVANT PROVISIONS OF THE FAMILY AND
   MEDICAL LEAVE ACT

     29 U.S.C. § 2601.................................................................... Add. 6

*Mack v. Georgetown Univ.*,
   No. 15-CV-793 (RMC/GMH), 2017 WL 4325596
   (D.D.C. Aug. 4, 2017) .............................................................. Add. 8

## RELEVANT PROVISIONS OF THE DISTRICT OF
## <u>COLUMBIA HUMAN RIGHTS ACT</u>

**D.C. Code § 2-1401.01:**

It is the intent of the Council of the District of Columbia, in enacting this unit, to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, sealed eviction record, status as a victim of an intrafamily offense, place of residence or business, status as a victim or family member of a victim of domestic violence, a sexual offense, or stalking, and homeless status.

## RELEVANT PROVISIONS OF THE AMERICANS
## WITH DISABILITES ACT

**42 U.S.C. § 12101:**

(a) Findings. The Congress finds that—

(1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

(7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

(8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

(b) Purpose. It is the purpose of this chapter—

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

Add. 3

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

### 42 U.S.C. § 12111(8)

Qualified individual. The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

### 42 U.S.C. § 12112(b)(5)(A)

Construction. As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes—

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an

applicant or employee, unless such covered entity can demonstrate that the

accommodation would impose an undue hardship on the operation of the business

of such covered entity;

# RELEVANT PROVISIONS OF THE FAMILY AND MEDICAL LEAVE ACT

**29 U.S.C. § 2601**

(a) Findings. Congress finds that—

(1) the number of single-parent households and two-parent households in which the single parent or both parents work is increasing significantly;

(2) it is important for the development of children and the family unit that fathers and mothers be able to participate in early childrearing and the care of family members who have serious health conditions;

(3) the lack of employment policies to accommodate working parents can force individuals to choose between job security and parenting;

(4) there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods;

(5) due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men; and

(6) employment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender.

(b) Purposes. It is the purpose of this Act—

(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;

(2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition;

(3) to accomplish the purposes described in paragraphs (1) and (2) in a manner that accommodates the legitimate interests of employers;

(4) to accomplish the purposes described in paragraphs (1) and (2) in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and

(5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause.

USCA Case #22-7111    Document #1976043    Filed: 12/02/2022    Page 69 of 90

Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)

2017 WL 4325596

2017 WL 4325596
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

Aleta MACK, Plaintiff,
v.
GEORGETOWN UNIVERSITY, Defendant.

Case No. 15-cv-793 (RMC/GMH)
|
Signed 08/04/2017

**Attorneys and Law Firms**

Aleta Mack, Arlington, VA, pro se.

William David Nussbaum, Aaron John Kornblith, Saul Ewing LLP, Washington, DC, for Defendant.

**REPORT AND RECOMMENDATION**

G. MICHAEL HARVEY, UNITED STATES MAGISTRATE JUDGE

**\*1** *Pro se* Plaintiff Aleta Mack ("Plaintiff") brings this action against her former employer, Georgetown University ("Defendant" or "Georgetown"), alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), codified at 42 U.S.C. § 12101 *et seq.* This matter was referred to the undersigned for a report and recommendation on Defendant's motion for summary judgment, which is now ripe for adjudication. Upon consideration of the motion and the entire record,[1] the undersigned recommends that the Court grant Defendant's motion.

[1]    The relevant docket entries for purposes of this Report and Recommendation are: (1) Plaintiff's Amended Complaint ("Am. Compl.") [Dkt. 14]; (2) Memorandum in Support of Defendant's Motion for Summary Judgment ("Def. Mot.") [Dkt. 56-1]; (3) Defendant's Statement of Undisputed Material Facts ("Def. SOF") [Dkt. 56-2]; (4) Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp.") [Dkt. 74]; (5) Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Resp.") [Dkt. 75];

(6) Plaintiff's Statement of Facts ("Pl. SOF") [Dkt. 75-1]; and (7) Reply in Support of Georgetown University's Motion for Summary Judgment ("Reply") [Dkt. 82]. All citations to page numbers within a particular document will be to the ECF docket page numbers assigned to the document.

**INTRODUCTION**

Plaintiff's *pro se* Amended Complaint contains two claims, both of which involve a series of requests for reasonable accommodations for her diabetes and rhinitis that she made while employed as an Executive Assistant at Georgetown in 2014 and 2015. Plaintiff first claims that: (1) Georgetown unlawfully denied her request to work off-site, which was prompted by her health care provider's conclusion that exposure to mold and dust mites in her workspace likely triggered her rhinitis; and (2) Georgetown effectively denied her request to be reassigned to a vacant position, which she initially made to accommodate her rhinitis and later made to accommodate both her rhinitis and her diabetes, by offering her an inferior position after an unreasonable delay. Second, Plaintiff claims that Defendant retaliated against her for making these requests and engaging in other protected activity under the ADA by threatening her, suspending her, and terminating her.

Plaintiff's claims are without merit for a variety of reasons. Chief among them is her failure to provide sufficient testimonial or documentary evidence to establish a genuine dispute of material fact. Indeed, Plaintiff has failed to establish facts sufficient to allow a reasonable jury to conclude that she would have been capable of performing the essential functions of her job even if she had been granted a reasonable accommodation. Likewise, Plaintiff has failed to provide facts sufficient to establish that there was a vacant position for which she was qualified at Georgetown superior to the position that she was ultimately offered for reassignment. Finally, as to her retaliation claim, the allegedly adverse actions that Plaintiff has identified are either too immaterial or insufficiently tied to her engagement in protected activity to support an ADA retaliation claim.

**\*2** Accordingly, the undersigned concludes that Defendant should be granted summary judgment on all of Plaintiff's claims.

## BACKGROUND

Before providing a recitation of the undisputed facts, the undersigned must, for clarity's sake, analyze the deficiencies in Plaintiff's *pro se* response to Defendant's statement of undisputed facts.

### A. Plaintiff's Response to Defendant's Statement of Material Facts

In support of its motion for summary judgment, Defendant submitted a statement of material facts which it claims supports the entry of summary judgment against Plaintiff. *See* Def. SOF. Plaintiff, in turn, submitted her own statement of facts in response. *See* Pl. SOF. The facts set forth in Part B of this section represent those facts presented by Defendant that Plaintiff does not dispute; any dispute raised by Plaintiff is addressed in the analysis as it arises. *See* L. Civ. R. 7(h) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

As a general matter, while Plaintiff attempts to dispute many of the facts proffered by Defendant, she fails to meet the standards for doing so under Rule 56 of the Federal Rules of Civil Procedure. Rule 56 requires a party disputing an asserted fact to support that dispute with citation to "particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A). The Rule further provides that a court need not consider materials not cited by a party in determining whether a genuine dispute of fact exists. *Id.* at 56(c)(3). Finally, the Rule warns that failing to properly address a fact permits a court to find that the fact is undisputed and, thus, conceded for purposes of summary judgment. *Id.* at 56(e); *see also* LCvR 7(h)(1) ("An opposition to ... a motion [for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement.").

The D.C. Circuit has repeatedly warned litigants against shirking their duties under Rule 56 and Local Rule 7(h). *See, e.g.*, *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996). In *Jackson*, the plaintiff fell short of his duty "to crystallize for the district court the material facts and relevant portions of the record" by failing to cite to parts of the factual record to support his opposition to the defendant's motion for summary judgment, and instead "[b]lending factual assertions with argument regarding their legal significance." *Id.* at 148–51. Noting that a district court should not be forced to comb through the factual record to ferret out disputes of material fact, the D.C. Circuit found that the plaintiff's statement of disputed facts, which was "[r]eplete with factual allegations not material to [the plaintiff's] substantive claims," was wholly inadequate. *Id.* at 153; *see also* SEC v. Banner Fund Int'l, 211 F.3d 602, 616 (D.C. Cir. 2000) (district court was "fully justified in treating as admitted [plaintiff's] statement of material facts" where defendant failed to "point[ ] to specific parts of the record controverting" those facts); *Robertson v. Am. Airlines, Inc.*, 239 F. Supp. 2d 5, 9 (D.D.C. 2002) (striking movant's statement of facts for "liberally mix[ing] facts with argument," which "does nothing to assist the court in isolating the material facts, distinguishing disputed from undisputed facts, and identifying the pertinent parts of the record").

**\*3** Here, the majority of Plaintiff's response to Defendant's statement of material facts does not meet the requirements of Rule 56 and Local Rule 7(h). In nearly every paragraph, Plaintiff fails to meaningfully respond to defendant's factual assertions. Of the 197 factual assertions forwarded by Defendant in its statement of facts, Plaintiff expressly concedes eight of them—statement nos. 1, 2, 9, 10, 16, 17, 21, and 22—and simply repeats a little over one hundred of them without offering any comment or additional information. [2] She claims that an additional forty-three assertions are immaterial, [3] and responds to twenty-four of them by offering additional, sometimes tangential information or legal argument without putting the underlying factual assertion in dispute. [4] She claims to dispute the remaining fourteen factual assertions—statement nos. 11, 18, 20, 34, 35, 141, 146, 153, 154, 155, 159, 160, 162, 163—but does so without pointing to any specific parts of the record controverting Defendant's factual assertions. *Id.* at 12–13, 30–41. In the few instances where Plaintiff references the record, she either does not provide the Court with the relevant evidence or appears to mischaracterize it. *See id.* at 7, 9–10 (citing to portions of her deposition testimony not provided to the Court). In short, Plaintiff's statement of facts contains the kind of factual assertions that the D.C. Circuit specifically cautioned against in *Jackson*, forcing this Court to sift through the record to determine which facts remain in dispute. What follows are the relevant facts that went undisputed or were inadequately disputed by Plaintiff.

Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)

2017 WL 4325596

2  *See, e.g.*, Pl. SOF at 2 ("Ms. Mack's Response to Georgetown's Statement No. 1: Not disputed"); *id.* at 14–31 (reproducing Defendant's statements of fact largely unedited).

3  *See, e.g.*, Pl. SOF at 43 ("Ms. Mack's Response to Georgetown's Statement No. 164–196: Disputed; Ms. Mack is disputing these statements because they are not material facts.").

4  *See, e.g.*, Pl. SOF at 33 (disputing Defendant's statement that Georgetown granted Plaintiff's request to reassign her to a vacant position but cautioned that it "may take some time to complete," by asserting that Georgetown's warning "was another unnecessary delay and failure to accommodate Ms. Mack when she had requested to be reassigned to the HR Analyst position, which was vacant" (providing no citation to the record)).

**B. Relevant Facts**

Defendant hired Plaintiff to work as an Executive Assistant in Georgetown's Department of Public Safety ("DPS") on February 19, 2014. Def. SOF at ¶ 32; Def. Ex. 9 [Dkt. 57-9] at 2. The position is a Grade 9 administrative one—it required Plaintiff to provide clerical and scheduling support to Jay Gruber ("Chief Gruber"), her supervisor and Georgetown's Chief of Police, as well as the Associate Director of DPS. Def. SOF at ¶¶ 32–34; Def. Ex. 10 [Dkt. 57-10] at 2–4. Specifically, the Executive Assistant is responsible for providing assistance with

> advanced scheduling, meeting planning, event management, travel arrangements, working group participation, answering phones/screening calls, and assisting callers with resolution of problems, compil[ing] dashboard and other reports, assist[ing] with campus outreach event planning and special projects such as audits and process analysis, purchasing and invoice processing, ProCard reconciliation, prepar[ing] expense reports, order[ing] office supplies, produc[ing], format[ting], and

> edit[ing] documents, presentations and event promotional materials, digital and paper filing, faxing, photocopying, reception services for the Chief, and other administrative and clerical responsibilities as needed.

*Id.* As compensation, she received a gross annualized salary of $50,000.08 and a standard employee benefits package. Def. Ex. 9 [57-9] at 2.

On July 14, 2014, roughly four months after she began working for Georgetown and shortly after she attended an employee orientation, Plaintiff submitted a disability accommodation request form to Michael Smith ("Smith"), the Director of Affirmative Action Programs at Georgetown's Office of Institutional Diversity, Equity, and Affirmative Action ("IDEAA"). Def. SOF at ¶¶ 38–39; Def. Ex. 13 [Dkt. 57-13] at 3–4. On the form, Plaintiff explained that she has "a physical disability that substantially limits the major life activity of endocrine function due to blood glucose level"—that is, type 2 diabetes, which she was diagnosed with in 2008—and requested eleven accommodations, including the provision of a discrete environment to monitor her blood sugar level, an area to store food and medication near her workspace, and scheduling flexibility for medical appointments. Am. Compl. at ¶ 13; Def. Ex. 14 [Dkt. 57-14] at 2–3. She also identified Dr. Rebecca Fitch as her primary care provider and authorized Dr. Fitch to release to Defendant all medical records concerning her disclosed disability and her capacity to perform job-related functions. *Id.* at 3. Three days later, Smith informed Plaintiff that Georgetown would largely provide her requested accommodations with some minor alterations. Def. SOF at ¶ 40; Def. Ex. 13 [Dkt. 57-13] at 5–6; Def. Ex. 15 [Dkt. 57-15] at 2–3. These proposed accommodations were agreed upon and put into effect on July 24, 2014, when Plaintiff and Georgetown representatives signed an accommodation agreement. Def. SOF at ¶ 41; Def. Ex. 16 [Dkt. 57-16] at 2–4. Five days later, Plaintiff alleges that she heard "derogatory remarks" about employees with disabilities during a Command Staff meeting. *See* Am. Compl. at ¶ 17.

 *4  On August 4, 2014, Plaintiff contacted her supervisor to inform him of a mildew odor and possible mold in the DPS building's ground-level administrative suite, where she worked. Def. SOF at ¶ 43; Def. Ex. 17 [Dkt. 57-17] at 2–4. That same day, members of Georgetown's Department of

Safety and Environmental Management ("SEM") toured the DPS building and observed a mold spot close to Plaintiff's workspace as well as a number of stained ceiling tiles. Def. SOF at ¶ 44; Def. Ex. 18 [Dkt. 57-18] at 3.[5] Safety and Environmental Management noted that flooding accidents have led to mold growth in that building in the past, and concluded that some moisture intrusion was "inevitable" given the building's " 'semi-basement' level" and humidity. *Id.* Nevertheless, according to a report from SEM, the flooding issue had been resolved, the stained tiles were replaced, and the mold growth was disinfected. *Id.*

[5]      A water pipe burst in the building in July 2014, damaging some of the ceiling tiles. *See* Pl. Ex. [Dkt. 81-4] at 4.

Plaintiff also met with her supervisor, Chief Gruber, on August 4, 2014 to discuss his concerns with her job performance. Def. SOF at ¶ 44; Def. Ex. 19 [Dkt. 57-19] at 2. According to an email Chief Gruber sent to Plaintiff summarizing the meeting, he: reminded her of the protocol for requesting overtime; reminded her to take and promptly distribute meeting notes during weekly Command Staff meetings; reminded her to maintain Chief Gruber's calendar, answer phones, and take notes; instructed her to provide administrative and coordinative support in the hiring process; assigned her a few new work projects; and reminded her to manage her time at work independently. *Id.* at 2–3. Two days later, Plaintiff contacted Smith again to request an opportunity to discuss an additional accommodation. Def. SOF at ¶ 47; Def. Ex. 20 [Dkt. 57-20] at 2. Smith responded that he could meet that day, but Plaintiff had already informed Joe Pappalardo, the Senior Business Manager at DPS, that she was feeling ill following a hyperglycemic episode and left work early. *See id.*; Def. Ex. 21 [Dkt. 57-21] at 2. That same day, Plaintiff saw an allergist, Dr. Sheryl Lucas, who noted that she was suffering from a headache and fatigue, possibly in response to the mold exposure at work. Def. SOF at ¶ 51; Def. Ex. 5 [Dkt.57-5] at 18. An allergy skin test taken that day was negative for mold but positive for dust mites. Def. Ex. 5 [Dkt. 57-5] at 18. An additional mold screening returned negative results and a CT scan of Plaintiff's sinuses revealed no significant sinus disease. *Id.* at 16–19; Def. SOF at ¶¶ 52–56.[6]

[6]      Prior to bringing this litigation, Plaintiff did not provide these test results to Georgetown. *See*

Def. Ex. 1 [Dkt. 57-1] at 125:10–125:13, 131:13–132:20.

Plaintiff did not return to work the following day and was not scheduled to work the day after that. Ex. 21 [Dkt. 57-21] at 2. She returned to work on August 11, 2014, and informed Chief Gruber that the mold by her workspace caused the medical incident from five days prior. *Id.* She requested to work remotely that day, but Chief Gruber denied that request because the essential duties of her job required her to be present in the office and instead permitted her to leave work early to see a doctor again. Def. Ex. 21 [Dkt. 57-21] at 2; *see also* Def. SOF at ¶ 60. That same day, Dr. Lucas wrote a letter "[t]o whom it may concern," stating that Plaintiff was "experiencing adverse reactions that correlate with mold exposure" and recommending that she be permitted to change "her work site to an area that has not had previous water damage." Def. Ex. 23 [Dkt. 57-23] at 2; Def. SOF at ¶ 61. The next day, Plaintiff submitted a second disability accommodation request form, explaining that she suffered from a disability, later identified as rhinitis,[7] that impairs her "breathing/respiratory function and working due to headache and fatigue," and requesting only one accommodation: reassignment to a vacant position. Def. SOF at ¶¶ 62–64; Def. Ex. 24 [Dkt. 57-24] at 2–3.

[7]      Broadly, "rhinitis refers to a heterogeneous group of nasal disorders characterized by [one] or more the following symptoms: sneezing, nasal itching, rhinorrhea, and nasal congestion." Mark S. Dykewicz & Daniel L. Hamilos, *Rhinitis and Sinusitis*, 125 Journal of Allergy and Clinical Immunology S103, S103–07 (2010). "Allergic rhinitis is the most common type of rhinitis," and can be caused by "proteins and glycoproteins in airborne dust mite fecal particles, cockroach residues, animal danders, molds, and pollens." *Id.* It is often accompanied by allergic conjunctivitis and itching of the ears and throat. *Id.*

**\*5** After Plaintiff submitted her second disability accommodation request, Smith referred her to Mary Spring ("Spring"), an employee in Georgetown's Department of Human Resources. Def. SOF at ¶ 65; Def. Ex. 25 [Dkt. 57-25] at 2. Spring placed Plaintiff on paid leave on August 12, 2014, and arranged for her to begin working in a new room on the same ground-level floor of the DPS building. Def. SOF at ¶ 66; Def. Ex. 26 [Dkt. 58-1] at 2; Am. Compl. at ¶ 21. Plaintiff reached out to Smith two days later, asking him to place her request for reassignment to a vacant position in her

Add. 11

accommodation plan. Def. SOF at ¶ 67; Def. Ex. 27 [Dkt. 58-2] at 2. Smith informed Plaintiff that since her request for reassignment stemmed from a different medical condition than the one that formed the basis of her previous plan, she would need to engage with Georgetown and her physicians again to develop a new plan pursuant to the ADA. *Id.* Smith also attempted to clarify Plaintiff's request, asking whether she was dissatisfied with the change in her work location and explaining that the mold issue in her old office had been remedied. *Id.*

Smith then contacted Plaintiff's physician, Dr. Lucas, and requested additional information on Plaintiff's disability. Def. SOF at ¶ 71; Def. Ex. 28 [Dkt. 58-3] at 2–3. Dr. Lucas responded on August 21, 2014, explaining that the symptoms of Plaintiff's impairment began on August 4, 2014 and substantially limited her ability to concentrate and breathe comfortably. *Id.* at 3–4. She recommended that Defendant allow Plaintiff to relocate to a workspace that has no water damage or obvious mold contamination, and only minimal dust mite exposure. *Id.* at 4. Around this time, Defendant retained the services of Air Cleaning Technologies, Inc., an environmental inspection consultant. Def. SOF at ¶ 74; Def. Ex. 29 [Dkt. 58-4] at 3. The company tested Plaintiff's original work location and the room to which she had been relocated and determined that there was no significant mold in either space. Def. SOF at ¶ 74; Def. Ex. 29 [Dkt. 58-4] at 3. On August 25, 2014, Smith contacted Plaintiff to inform her of these results and let her know that, while her physician's recommendation to relocate her was no longer necessary, she could continue to work out of her new location while Defendant arranged for her old work space to be tested for dust mites. Def. Ex. 31 [Dkt. 58-6] at 2. Another company tested her work area for dust mites and determined that there was no significant risk of dust mite exposure either. Def. SOF at ¶¶ 77–78; Def. Ex. 30 [Dkt. 58-5] at 4. Despite these results, Plaintiff continued to report experiencing headaches while working in her new office. Am. Compl. at ¶¶ 23–24.

Plaintiff met with Chief Gruber on August 26, 2014 to discuss concerns with her job performance for a second time. Def. SOF at ¶ 80; Def. Ex. 32 [Dkt. 58-7] at 2. Chief Gruber again informed Plaintiff of her job responsibilities, including her obligation to keep the "Uniform Room" in order and to promptly send him notes from Command Staff meetings. *Id.* at 2–3. Chief Gruber also provided Plaintiff with new assignments—a "scanning project" and an invitation drafting assignment—but Plaintiff informed him multiple times that she was "too fatigued and lethargic" to complete her work

and needed additional accommodations. *Id.*; *see also* Def. SOF at ¶ 82. [8] After her meeting with Chief Gruber, Plaintiff requested a short break to eat a snack to raise her blood sugar, but failed to return to the Command Staff meeting scheduled later that day. Chief Gruber noted in his record of the meeting that he informed Plaintiff that her failure to attend events without prior notice was unacceptable. Def. Ex. 32 [Dkt. 58-7] at 3.

[8]     As Defendant notes, despite claiming to be too fatigued to take on new work on August 26, 2014, Plaintiff admitted during the course of discovery that she ran a half-marathon that month. *See* Def. Ex. 1 [Dkt. 57-1] at 189:13–189:22.

At the same time, Plaintiff continued to request from Chief Gruber and Smith that she be permitted to work in a different building or remotely. Def. SOF at ¶ 86; Def. Ex. 34 [Dkt. 58-9] at 2–5; *see also* Am. Compl. at ¶¶ 24–26. Chief Gruber informed her that any accommodations had to come through an interactive process with IDEAA and that she was expected to report to work in her new office in the DPS building. Def. Ex. 34 [Dkt. 58-9] at 3–5. Additionally, Chief Gruber informed Smith that the essential functions of Plaintiff's job require her to be physically present for work and that he would have no work for her to do if she worked off-site. Def. SOF at ¶ 88; Def. Ex. 35 [Dkt. 58-10] at 3. Smith replied to Plaintiff's request by letting her know that, based on testing of her work site for mold and dust mites, he did not believe that she required an accommodation that allowed her to work outside the building. Def. Ex. 35 [Dkt. 58-10] at 3. In his correspondence with Plaintiff, Smith additionally acknowledged her request to be reassigned to a vacant position, informing her that he would provide a response to that request "in a reasonable period of time." *Id.* When Plaintiff persisted in her request to work in an interim location, Smith told Plaintiff that he would be happy to re-engage her physician to clarify the specific condition that prevented her from working in her office. *Id.* at 2. Two days later, on August 28, 2014, Plaintiff spoke with an investigator at the U.S. Equal Employment Opportunity Commission ("EEOC") regarding the alleged disability-based discrimination and retaliation that she was experiencing at work. *See* Am. Compl. at ¶¶ 29–30. The eventual EEOC charge, which she filed on August 28, 2014, alleges that Defendant discriminated against her by ignoring or denying her requests for reasonable accommodations, and then harassed her in retaliation for asserting her rights as a person with a disability. Def. Ex. 41 [Dkt. 58-16] at 5.

**\*6** That same day, Smith contacted Plaintiff again, this time in regards to the meeting she had with Chief Gruber two days prior. Def. SOF at ¶ 89; Def. Ex. 36 [Dkt. 58-11] at 2. Chief Gruber had informed Smith that Plaintiff claimed to be unable to complete the essential functions of her job due to lethargy and fatigue. *Id.* Accordingly, Smith told Plaintiff that he would reach out to Dr. Fitch and Dr. Lucas—the two physicians who previously provided reports for Plaintiff's accommodation requests—to get more information on her medical conditions and whether additional accommodations would help. *Id.* He reiterated, however, his belief that her old workspace was mold- and dust-mite-free and informed her that her request for permission to work remotely would thus not be considered. *Id.* In his letter to Plaintiff's health care providers, Smith detailed the history of Plaintiff's accommodation requests, informed them that telework was not a possibility for Plaintiff because the essential functions of her job require that she work on-site, and requested information related to any additional reasonable accommodations that they believed would help Plaintiff perform the essential functions of her job. Def. SOF at ¶¶ 90–92; Def. Ex. 37 [Dkt. 58-12] at 2–3. Neither doctor responded to Smith's inquiry, but another doctor—Dr. Daniel Glor, a neurologist—sent an unsolicited response recommending that Plaintiff be transferred to a different office or building. *See* Pl. Ex. [Dkt. 81-4] at 7–8. Smith then reached out again to Drs. Lucas, Fitch, and Glor on September 2, 2014, providing them with the test results showing no risk of mold or dust mite exposure in Plaintiff's workspace and asking if they could better explain their recommendation or whether any additional accommodations would help her perform the essential functions of her job. Def. Ex. 38 [Dkt. 58-13] at 2–3; Def. Ex. 39 [Dkt. 58-14] at 5–8.

Unbeknownst to Defendant, Plaintiff had instructed her doctors not to respond to additional requests for medical information from Georgetown. Def. SOF at ¶ 95; Def. Ex. 5 [Dkt. 57-5] at 5, 11, 12, 14. An IDEAA representative contacted Plaintiff on September 22, 2014 to let her know that Georgetown had not yet received a response to its request for clarification from Drs. Fitch or Lucas, and contacted them again. Def. SOF at ¶ 99; Def. Ex. 40 [Dkt. 58-15] at 2. Both doctors reached out to Plaintiff on the same day to make sure that Georgetown knew that she had revoked her authorization for them to share her medical information, but it is not clear what steps, if any, Plaintiff took to make this known. Def SOF at ¶¶ 99–104; Def. Ex. 5 [Dkt. 57-5] at 7–8.

During this time, Plaintiff continued to struggle professionally at work. *See* Am. Compl. at ¶ 32. On September 5, 2014, Chief Gruber provided Plaintiff with a written warning that her job performance was unsatisfactory. Def. SOF at ¶ 109; Def. Ex. 45 [Dkt. 58-20] at 2. The warning explained that Plaintiff had repeatedly failed to provide him with notes from weekly management meetings and had failed to begin working on a "scanning project" as instructed. *Id.* After receiving this report and meeting with Chief Gruber, Plaintiff sent an email alleging that she was verbally abused by Chief Gruber to IDEAA's Vice-President, which the Vice-President forwarded to Human Resources. Def. SOF at ¶ 110; Def. Ex. 46 [Dkt. 58-21] at 2–3. More specifically, she claimed in the email that she was "experiencing fast heartbeats" on the afternoon of September 5, 2014 after Chief Gruber asked her to meet with him, and that Chief Gruber denied her request to leave early to go to the Georgetown's student health center. *Id.* According to Plaintiff's email, Chief Gruber ordered her to meet with him in a "boisterous" voice and appeared threatening, but also asked her if he should call Georgetown Emergency Response Medical Service pursuant to her ADA accommodations plan. *Id.* at 3. Despite Chief Gruber's alleged command and after he "loudly state[d] that [she] was disobeying his direct orders," Plaintiff left work and went to Georgetown's student health center, where a nurse informed her that her blood pressure was "extremely high." *Id.* She alleges that she received urgent care after speaking with the nurse, and that Chief Gruber's behavior that afternoon, and on several other occasions, frightened her to the point of impacting her health. *Id.* at 4.

The Human Resources Department then initiated an investigation into Plaintiff's allegations. During an interview with a Human Resources specialist, Plaintiff reported another incident that occurred on September 9, 2014, in which Chief Gruber allegedly stood in a doorway to her office unannounced and stared at her. *See* Am. Compl. at ¶ 33; Def. Ex. 48 [Dkt. 58-23] at 4. Plaintiff reported that her heart began to race when she noticed him and that Chief Gruber appeared defensive. *Id.* She then allegedly ran out of her office and asked someone to call IDEAA while she attempted to leave. *Id.* Plaintiff alleges that Chief Gruber refused to permit her to leave and blocked her from collecting her belongings. *Id.* Plaintiff reported that she felt threatened by Chief Gruber's behavior and that he only relented after other officers walked by. *Id.* Her medical records indicate that she reported a work incident with her boss to Dr. Fitch a few days later, and that Dr. Fitch prescribed her Xanax as a result. *See* Def. Ex. 5 [Dkt. 57-5] at 9.

Add. 13

USCA Case #22-7111    Document #1976043    Filed: 12/02/2022    Page 75 of 90

**Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)**

2017 WL 4325596

**\*7** At the end of the investigation, which included interviews with multiple witnesses, the Human Resources Department concluded that Chief Gruber did not act in a threatening manner on either September 5, 2014 or September 9, 2014. Instead, based on a majority of the interviews and a review of security footage, Human Resources determined that Chief Gruber was calm—not loud or threatening— during both incidents, and that Plaintiff's accusations were "unfounded." Def. Ex. 48 [Dkt. 58-23] at 3–12. Additionally, according to the report, Chief Gruber repeatedly asked Plaintiff whether she needed accommodation or wanted him to contact Georgetown Emergency Response Medical Service after she became agitated on both dates. *Id.* To be sure, two DPS employees told Human Resources that Chief Gruber sounded abrasive and intended to intimidate Plaintiff during these two incidents, but Human Resources found that these individuals were not entirely present for them and that their descriptions of the events contradicted the majority of the witnesses' descriptions and video surveillance footage. *See id.*[9]

[9]    Plaintiff submitted letters written by two employees in support of her opposition to Defendant's motion for summary judgment. In their statements, the employees suggest that Chief Gruber and other employees at DPS bullied and intimidated Plaintiff on multiple occasions, including during the incidents described herein. [Dkt. 81] at 2–4; *see also* Pl. Exh. 2 [Dkt. 81-2] at 2–3.

On October 14, 2014, Chief Gruber suspended Plaintiff for three days "based on [her] continued unacceptable work performance and misconduct regarding tardiness and failure to follow call-in procedures, declining calendar appointments and subsequent untruthfulness, and refusals to meet with [her] supervisor." Def. SOF at ¶ 106; Def. Ex. 44 [Dkt. 58-19] at 2. A memorandum prepared by Chief Gruber informing Plaintiff of her suspension outlined a string of incidents —including multiple instances where Plaintiff left work without permission, showed up late without explanation, failed to complete assignments that she had been given, and interacted inappropriately with her co-workers—that led to her suspension, and notified her that failure to improve her work performance may result in termination. *Id.* at 2–4. Plaintiff, on the other hand, believes that she was suspended for seeking medical attention during the incidents in September described above. *See* Am. Compl. at ¶¶ 32–

33, 36. The next day, Plaintiff reached out to Human Resources, claiming that her condition had worsened and that she was unable to communicate with Chief Gruber without experiencing a deep state of fear. Def. SOF at ¶ 115; Def. Ex. 49 [Dkt. 58-24] at 2.

A few days later, on October 17, 2014, Plaintiff asked Smith to be reassigned to a vacant position as a reasonable accommodation under her July 2014 ADA plan. Def. SOF at ¶ 116; Def. Ex. 50 [Dkt. 58-25] at 5. She included in her correspondence a letter from her physician describing her type 2 diabetes diagnosis and its accompanying symptoms. *Id.* at 4. Smith informed her that she had not provided him with any new information about her condition that would warrant reassignment to a vacant position and denied her request. *Id.* Plaintiff responded the next day, explaining that the symptoms associated with her diabetes had worsened and were preventing her from performing the essential functions of her jobs, including completing tasks in a timely manner. *Id.* at 3. Smith let Plaintiff know that her admitted inability to perform the essential functions of her job may disqualify her from protection under the ADA. *Id.* In response, Plaintiff reiterated her request that she be reassigned to a vacant position and noted that she is qualified for a number of positions at Georgetown. *Id.* Apparently confused by Plaintiff's statements, Smith let her know that he would reach out to Dr. Fitch to determine the exact limitations associated with Plaintiff's condition and, in the meantime, would place her on an unpaid leave of absence as an accommodation. *Id.* at 2; Def. SOF at ¶ 125.

**\*8** On October 27, 2014, Dr. Fitch responded to Smith's request, explaining that Plaintiff had complained of palpitations, shakiness, and increased thirst and hunger, all of which are symptoms associated with extreme changes in blood sugar. Def. SOF at ¶ 128; Def. Ex. 54 at [Dkt. 59-4] at 2. Given the demands of Plaintiff's job and the fact that her symptoms persist despite the provided accommodations, Dr. Fitch opined that Plaintiff would benefit from reassignment to a vacant position. *Id.* On November 9, 2014, the day before Plaintiff was scheduled to return to work, Smith informed her that Dr. Fitch's report did not provide any new information that warranted reassignment to an open position because her symptoms could be managed under her current ADA plan. Def. SOF at ¶ 129; Def. Ex. 55 [Dkt. 59-5] at 2–3. Nevertheless, Smith volunteered to meet with Plaintiff to review her ADA plan and to ensure that her accommodations were provided. *Id.* at 2. In response, Plaintiff reiterated that she could no longer perform the essential functions of her job

Add. 14

2017 WL 4325596

and pleaded with Smith to reassign her to another position for which she was qualified. *Id.* Smith agreed to meet with her, but instructed her to report to her current position on November 10, 2014. *Id.*

Upon returning to work, Plaintiff began complaining to Chief Gruber about the level of dust at her workstation in the office that she had been reassigned to in August 2014. Def. SOF at ¶ 132; Def. Ex. 56 [Dkt. 59-6] at 3–4. She indicated that her eyes were burning and that she was coughing uncontrollably, and requested that she be relocated to a new office. *Id.* A few hours later, Plaintiff informed her supervisors that she would need to leave work to meet with her physician due to persistent headaches. *Id.* at 3. That same day, Dr. Lucas sent Defendant a medical report explaining that Plaintiff developed a severe headache within minutes of returning to work and that the headache only improved after she left. Def. Ex. 57 [Dkt. 59-7] at 2. Accordingly, Dr. Lucas recommended that Plaintiff be permitted to work from a different location. *Id.* In response, Smith extended Plaintiff's unpaid leave until the end of the week to reassess her accommodation request. *See* Def. Ex. 58 [Dkt. 59-8] at 2. While Georgetown maintained that the mold and dust mite problems had been resolved, Smith arranged for an industrial-grade air purifier to be placed in Plaintiff's office and instructed her to report to work on November 17, 2014. Def. SOF at ¶¶ 137–38; Def. Ex. 59 [Dkt. 59-9] at 2. When she returned to work, Plaintiff immediately began complaining of similar symptoms and informed the Human Resources Department that she would be unable to report to work the following day. Def. SOF at ¶ 139; Def. Ex. 60 [Dkt. 59-10] at 2.

On November 19, 2014, Smith reached out to Plaintiff again, reminding her of the steps that Georgetown had taken to remove any irritants from her workspace and explaining that she had provided no documentation beyond reports of headaches and respiratory symptoms explaining the nature of the medical condition that required accommodation. Def. SOF at ¶¶ 140–41; Def. Ex. 61 [Dkt. 59-11] at 2. Following up with her physicians, according to Smith, provided little clarification. *Id.* Dr. Lucas, for example, did not identify any underlying medical condition or provide information sufficient for Georgetown to determine how best to accommodate Plaintiff. *Id.* According to Smith, Dr. Fitch had been similarly unhelpful in response to Georgetown's requests for information related to Plaintiff's diabetes. *Id.* In order to develop an accommodation plan that would work for Plaintiff, Smith thus requested that she report for a medical examination with a professional of Georgetown's choice to

determine the nature of the underlying medical condition impacting her ability to perform the essential functions of her job, at no cost to her. *Id.* at 3. In response, Plaintiff forwarded Smith a number of letters from her physicians regarding her conditions, including a detailed letter from Dr. Lucas that diagnosed Plaintiff with chronic rhinitis with headaches, shortness of breath, allergic rhinitis, and allergic conjunctivitis. Def. SOF at ¶ 144; Def. Ex. 62 [Dkt. 59-12] at 2. The letter further explains that Plaintiff had repeatedly reported feeling ill at work because "she is most likely inhaling mold, bacteria and other microbial agents" in her workspace. *Id.* 2–4. Accordingly, Dr. Lucas recommended that Plaintiff avoid the first-floor, semi-basement level of the DPS building and be reassigned to another position in another building that has not experienced water damage. *Id.* at 4.

**\*9** In light of Dr. Lucas' letter, Smith informed Plaintiff that an independent medical evaluation would no longer be necessary and that Georgetown had determined that she would be unable to perform the essential functions of her current position with or without accommodations. *See* Def. Ex. 63 [Dkt. 59-13] at 4. As a last resort, Smith indicated that Georgetown would search for an appropriate, vacant position for her. Def. SOF at ¶ 145; Def. Ex. 63 [Dkt. 59-13] at 4. In the meantime, Smith informed Plaintiff that she would need to serve her outstanding three-day unpaid suspension and could return to work in an unspecified temporary position beginning on December 1, 2014. *Id.* Mack responded that the suspension was discriminatory and informed Smith that she was interested in a Human Resources Analyst position, which she found by searching Georgetown's online job listings. *Id.* at 3. On November 26, 2014, Smith informed Plaintiff that Human Resources would be in charge of searching for a vacant, permanent position for her, and that she should report to a new building on December 1, 2014, where she would work on a temporary assignment for the Georgetown Police Department. *Id.* at 2.

Dissatisfied with that offer, Plaintiff informed Smith by email on November 27, 2014 that she would rather be placed on unpaid leave. Def. SOF at ¶ 148; Def. Ex. 64 [Dkt. 59-14] at 2. Smith granted Plaintiff's request on November 30, 2014 and noted that the search for vacant positions would "take some time to complete." *Id.* After evaluating a number of positions, *see* Def. SOF at ¶ 151, a Human Resources specialist told Plaintiff on January 29, 2015 that they had identified an available position as a Recruiting Coordinator in the Cawley Career Education Center for which she was qualified. Def. SOF at ¶ 152; Def. Ex. 72 [Dkt. 59-22] at 2. This Grade 9

Add. 15

position paid an annual salary of $45,000 and included a six-month probationary period. *Id.* Human Resources instructed Plaintiff to respond to the offer by February 2, 2015. *Id.*

Plaintiff did not respond by that date, however, and Spring and Smith arranged to meet with her on February 13, 2015. Def. SOF at ¶ 156; Def. Ex. 73 [Dkt. 59-23] at 2. At the meeting, Spring and Smith presented her with the Recruiting Coordinator position and discussed three positions that Plaintiff had expressed an interest in: a Grade 8 position as a Publishing Assistant that paid $38,000 per year; a Grade 9 position as a Business Manager that paid between $48,000 and $55,000 per year; and a position as a Human Resources Analyst that had been filled. Def. SOF at ¶ 157; Def. Ex. 74 [Dkt. 59-24] at 2. According to Spring, Plaintiff's resume did not establish the requisite three to five years of management experience to qualify her for the Business Manager, and, thus, Spring instructed her to either accept the Recruiting Coordinator position by February 20, 2015, or "designate one of the other two vacancies ... (Business Manager of Publishing Assistant) for further discussion." *Id.* at 2–3; Def. SOF at ¶¶ 157–60. In order to discuss the Business Manager position, however, Spring told Plaintiff that she must submit an updated resume highlighting her managerial experience. Def. Ex. 74 [Dkt. 59-24] at 2. Plaintiff indicated that she would, but the record reflects that she instead emailed Spring on February 20, 2015, stating that she has "budget management skills from Lawrence Technological University and [her] undergraduate studies at University of Detroit Mercy." *Id.* at 2; *see also* Def. Ex. 75 [Dkt. 59-25] at 2.

On February 23, 2015, Spring informed Plaintiff that the information she provided did not satisfy the Business Manager position's requirements. Def. SOF at ¶ 159–61. Spring extended Plaintiff's time to accept the Recruiting Coordinator position to March 5, 2015 and informed her that Georgetown would consider a failure to accept the offer by that date to be a resignation. *Id.* Plaintiff did not respond to the offer and, on March 6, 2015, Georgetown terminated her employment as an Executive Assistant. Def. SOF at ¶ 163; Def. Ex. 77 [Dkt. 60-2] at 2. [10]

[10]    Defendant's Statement of Undisputed Material Facts contains an account of Plaintiff's employment as an Administrative Assistant at Lockheed Martin and, later, as a Project Coordinator at CGI Federal, Inc. following her termination from Georgetown. *See* Def. SOF at ¶¶ 164–97. The facts proffered by Defendant establish that Plaintiff

requested accommodations for diabetes, chronic hypertension, and anxiety while employed at Lockheed Martin, and was later fired from the company after she indicated that her anxiety prevented her from performing the essential functions of her job. *Id.* at ¶¶ 185–86. Following her termination from Lockheed Martin, she obtained a job at CGI Federal, Inc. and requested accommodations for diabetes, hearing loss, and anxiety. *Id.* at ¶¶ 190–91. Based on these facts, Defendant believes that Plaintiff suffers from an anxiety disorder, which she did not disclose to Georgetown. *See* Def. Mot. at 30–32. Defendant contends that the disorder prevented her from performing the essential functions of her job at Georgetown—an allegation which Plaintiff denies. *Id.*; Resp. at 9–11. The undersigned does not find these facts material to the Court's adjudication of the case.

**C. Procedural Background**

***10**  Plaintiff filed her first EEOC charge of discrimination against Georgetown on August 28, 2014. *See* Am. Compl. at p. 35. In that charge, she alleges that she faced disability discrimination when her requests for accommodations were denied, and then was subjected to retaliation after hearing "derogatory remarks" about employees with disabilities. *Id.* She amended this charge on February 12, 2015, claiming that she was subjected to additional harassment in the form of improper infraction warnings from her supervisor and an eventual three-day suspension for, in her view, "becoming ill and seeking medical attention." *Id.* at p. 37–39. She also alleges in this charge that Georgetown refused to accommodate her rhinitis, forcing her to work in an environment that caused her "physical and mental injuries." *Id.* Finally, she claims that she was denied a reasonable accommodation when she was not reassigned to a Human Resources Analyst position for which she believed she was qualified. *Id.* On March 2, 2015, the EEOC dismissed Plaintiff's charge after finding no evidence of an ADA violation. *Id.* at p. 29.

Plaintiff filed a second EEOC charge against Georgetown on March 11, 2015, again alleging disability discrimination and retaliation, in response to her March 6, 2015 termination. *Id.* at p. 41. The EEOC dismissed Plaintiff's charge and notified her of her right to sue in federal court. *Id.* at p. 32. Plaintiff filed her initial Complaint in this Court on May 29, 2015. *See*

Add. 16

2017 WL 4325596

Compl. [Dkt. 1]. Following discovery, Defendant now moves for summary judgment. *See* Def. Mot.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.' " *Steele v. Schafer,* 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants–CWA, AFL–CIO v. Dep't of Transp.,* 564 F.3d 462, 465–66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.,* 651 F.3d 118, 123 (D.C. Cir. 2011). The process is guided by a number of related principles, including, initially, that the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the party's favor, *Grosdidier v. Broad. Bd. of Gov.,* 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find"

for the non-moving party. *Anderson,* 477 U.S. at 252. If the evidence, for example, "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50. Moreover, the non-moving party "may not rest upon mere allegation or denials of his pleadings but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy,* 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson,* 477 U.S. at 249 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)). Likewise, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and, in that scenario, the moving party is entitled to summary judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323.

**\*11** Further, it is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.,* 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine dispute for trial." *Id.* In employment discrimination or retaliation cases, district courts approach summary judgment motions with "special caution" due to the "potential difficulty for a plaintiff ... to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden,* 40 F. Supp. 3d 104, 115 (D.D.C. 2014). Nonetheless, a plaintiff is obligated to support her allegations by competent evidence. *Id.* Accordingly, a plaintiff may not avoid summary judgment through "conclusory allegations and speculation." *Id.* (citing *Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999)).

## ANALYSIS

The parties' dispute requires the Court to make a threshold determination of the claims that Plaintiff has properly presented for adjudication. Though Plaintiff's *pro se* Amended Complaint does not contain a typical recitation of specific claims, it does clearly allege that she was "discriminated against on the basis of [her] disability and retaliated against for engaging in protected activity, in violation of the [ADA]." Am. Compl. at ¶ 46. To confirm

Add. 17

USCA Case #22-7111    Document #1976043    Filed: 12/02/2022    Page 79 of 90

Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)

2017 WL 4325596

the scope of her allegations, Defendant asked Plaintiff during her deposition in this matter if her claims are that Georgetown denied her reasonable accommodations and retaliated against her. *See* Def. Ex. 1 [Dkt. 57-1] at 350:1–350:17. She confirmed that to be the case then, *see id.*, and Defendant fairly relied on that representation. In her opposition to Defendant's motion for summary judgment, however, Plaintiff asserts for the first time that she is also raising a hostile work environment claim. *See* Pl. Opp. at 1. Defendant objects to the late presentation of this claim. *See* Reply at 5. Because Plaintiff's Amended Complaint does not assert a hostile work environment claim and because Defendant was first notified that Plaintiff seeks to raise a hostile work environment claim in her response to Defendant's pending dispositive motion, the undersigned recommends denying Plaintiff's request, to the extent she is making one, to constructively amend her Amended Complaint to assert a hostile work environment claim. *See Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011) ("[P]laintiffs cannot use their summary judgment briefing to press claims not raised in their amended complaint."); *Turner v. Shinseki*, 824 F. Supp. 2d 99, 122–23 (D.D.C. 2011). Indeed, Defendant's failure to brief Plaintiff's hostile work environment theory in the instant motion makes clear that this claim has not been "tried by the express or implied consent of the parties," and, thus, should not be considered by the Court. *Id.* at 122 n.23 (quoting Fed. R. Civ. P. 15(b)).

Accordingly, the undersigned finds that Plaintiff's claims fall into two categories: (1) discrimination in violation of Title I of the ADA based on Georgetown's alleged failure to accommodate her requests to work off-site and to be reassigned to a new position; and (2) retaliation for engaging in protected activity, in violation of Title IV of the ADA. Defendant first argues that it is entitled to summary judgment on Plaintiff's failure-to-accommodate claim because there is no genuine dispute that: (1) Plaintiff was unable to perform her job due to her type 2 diabetes and her undisclosed anxiety disorder; (2) Georgetown engaged in the ADA-required interactive process in good faith to provide Plaintiff with reasonable accommodations for her disabilities; and (3) Plaintiff did not engage with Georgetown in good faith by withholding information. *See* Def. Mot. at 26–41. Plaintiff counters by contending broadly—and, at times, opaquely—that she was a qualified individual capable of performing the essential functions of her job with reasonable accommodations, that Georgetown failed to make these reasonable accommodations, and that Georgetown failed to engage with her in good faith. *See generally* Pl. Opp.; *see*

*also* Resp. at 1–14. With respect to Plaintiff's retaliation claim, Defendant argues that it is entitled to summary judgment because: (1) Plaintiff has failed to establish a causal link between any actual adverse employment action and her engagement in ADA-protected activity; and (2) some of the incidents identified by Plaintiff are too immaterial to qualify as adverse employment actions. Def. Mot. at 41–45. Plaintiff again argues in broad terms the opposite. *See* Pl. Opp. at 4; *see also* Resp. at 5–7.

**\*12** The undersigned addresses each claim in turn.

### A. Plaintiff's Failure-to-Accommodate Claim

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to ... the hiring, advancement, or discharge of employees, ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA further provides that discrimination includes the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... the accommodation would impose an undue hardship" on the employer. *Id.* at § 12112(b)(5)(A). Such reasonable accommodations may include "making existing facilities ... readily accessible to and usable by individuals with disabilities," as well as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, ... and other similar accommodations[.]" *Id.* at § 12111(9).

To withstand a summary judgment motion on a failure-to-accommodate claim, an employee must produce sufficient evidence to allow a reasonable jury to conclude that: (1) she had a disability within the meaning of the statute; (2) her employer had notice of her disability and any accompanying limitations; (3) she could perform the essential functions of her job with reasonable accommodations; and (4) her employer refused to make those accommodations. *Doak v. Johnson*, 798 F.3d 1096, 1105 (D.C. Cir. 2015); *Adams v. Dist. of Columbia*, 50 F. Supp. 3d 47, 53 (D.D.C. 2014). [11] Here, there appears to be no dispute that Plaintiff had disabilities—type 2 diabetes and rhinitis—and that Georgetown was aware of them. *See* Def. Mot. at 27. Instead, the central questions raised by Defendant are whether she was capable of performing the essential functions of her job even with reasonable accommodations and whether Georgetown denied her those accommodations. The undersigned will consider

Add. 18

2017 WL 4325596

these questions in the context of each of her requested accommodations—that is, with respect to her request to work off-site and her request to be reassigned to a vacant position.

11    "Because '[t]he employer's motivation for refusing the accommodation plays no part in [this] analysis, reasonable-accommodation claims are not subject to analysis under [the familiar] *McDonnell-Douglas*' framework utilized in assessing most employment discrimination claims." *Hill v. Assocs. For Renewal in Educ., Inc.*, 69 F. Supp. 3d 260, 265–66 (D.D.C. 2014) (quoting *Floyd v. Lee*, 968 F. Supp. 2d 308, 316 (D.D.C. 2013)).

### 1. Plaintiff's Request to Work Off-Site

The first question presented by Defendant's motion—whether Plaintiff was capable of performing the essential functions of her job with an accommodation—is not a straightforward inquiry. To receive protection as a "qualified individual" under the ADA, an employee must be able to perform the essential functions of her job with or without accommodations. 42 U.S.C. §§ 12111(8) and 12112(a). Put differently, an employer need not provide an accommodation to an employee if she "could not perform the essential functions of [her] job even with such an accommodation," or "if it would impose an 'undue hardship' on the employer" such that the accommodation would be unreasonable. *Adams*, 50 F. Supp. 3d at 53–54. " 'Essential functions' are the fundamental duties of a position," [12] and courts typically "defer to the employer's judgment as to what functions of a job are essential." *Saunders v. Gallagher & Huguely Assocs., Inc.*, 741 F. Supp. 2d 245, 248 (D.D.C. 2010) (internal citations omitted); *see also* 42 U.S.C. § 12111(8). Further, to be a qualified individual under the ADA, "a plaintiff alleging a failure to accommodate [claim] 'must establish her ability to perform' the essential functions of her job 'at the time the employer denied her request for accommodation.' " *Reagan-Diaz v. Sessions*, ––– F. Supp. 3d ––––, 2017 WL 1194162, at *9 (D.D.C. March 30, 2017) (quoting *Minter v. Dist. of Columbia*, 809 F.3d 66, 70 (D.C. Cir. 2015)).

12    EEOC regulations define "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Evidence of whether a function is essential includes: an explanation that the job exists to perform that

function; the employer's judgment; written job descriptions advertising the position; the amount of time spent on the job performing the function; and the consequences of not requiring the employee to perform the function. *Id.* at §§ 1630.2(n)(2) and (n)(3).

**\*13** Defendant argues that Plaintiff was not a qualified individual under the ADA beginning in October 2014 because she repeatedly admitted that she was unable to perform the essential functions of her job as an Executive Assistant to Chief Gruber, ostensibly due to an exacerbation of the symptoms of her diabetes. *See* Def. Ex. 32 (Dkt. 58-7) at 3; Def. Ex. 50 [Dkt. 58-25] at 2 ("As I mentioned previously, I can no longer perform my essential functions in my current position as the Executive Assistant to the Chief of Police."); *id.* at 3 ("I can no longer perform the essential functions of my current position [because of an increased manifestation of diabetes-related symptoms.]"); Def. Ex. 55 [Dkt. 59-5] at 2 ("Since I can no longer perform the essential functions in my current position as Executive Assistant to the Chief of Police, with or without accommodation, because of my disability...."). Plaintiff acknowledges these admissions, *see* Pl. SOF at 26–27, but nevertheless contends, without citation to supporting evidence, that she was capable of performing the essential functions of her job and other available jobs at Georgetown with reasonable accommodations. *See id.* at ¶ 110; *also* Resp. at 19. Specifically, Plaintiff argues that she and her physicians determined that she would have been able to perform her job had she been permitted to work off-site—a request that Georgetown denied in late August 2014. *Id.*; *see also* Def. Ex. 34 [Dkt. 58-9] at 3. [13] But, as noted, a plaintiff's capacity to perform the essential functions of her job is examined *at the time of* the denial of accommodations. *See Reagan-Diaz v. Sessions*, ––– F. Supp. 3d ––––, 2017 WL 1194162, at *9. Accordingly, Defendant's contention that it can wash its hands of any responsibility for allegedly denying Plaintiff's request for reasonable accommodation in violation of the ADA in August 2014 by pointing to her October 2014 statements regarding her inability to perform the essential functions of her job—particularly when Plaintiff's health care provider opined that she could perform her job with certain accommodations—is unavailing. *See Minter*, 809 F.3d at 70 ("The plaintiff must establish her ability to perform those functions (with or without reasonable accommodation) at the time the employer denied her request for accommodation."); *see also id.* (finding no genuine dispute regarding Plaintiff's inability to perform her job at the time of the reasonable-accommodation denial where her physician explained that she was "totally disabled" before that denial); *Basden v.*

Add. 19

USCA Case #22-7111    Document #1976043    Filed: 12/02/2022    Page 81 of 90

Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)

2017 WL 4325596

*Prof'l Transp., Inc.*, 714 F. 3d 1034, 1037 (7th Cir. 2013) ("[The plaintiff's] ability to work, or to otherwise perform the essential functions of her job, is examined as of the time of the adverse employment decision at issue.").

13    To summarize: on Plaintiff's August 12, 2014 disability accommodation request form, her only request for accommodation was to be reassigned to a vacant position. *See* Def. Ex. 24 [Dkt. 57-24] at 3. Her physician, Dr. Lucas, however, recommended that she simply avoid inhaling mold by moving to a workspace unaffected by water damage or working remotely. *See* Def. Ex. 23 [Dkt. 57-23] at 2. After receiving her request and her doctor's recommendation, Georgetown moved Plaintiff to a different room on the same floor of the DPS building while they attempted to resolve the mold problem in her old workspace. *See* Def. Ex. 25 [Dkt. 57-25] at 2; *see also* Def. Ex. 26 [Dkt. 58-1] at 2. Dr. Lucas expanded on her position in a second form, which Georgetown received on August 21, 2014, explaining that Plaintiff could perform the essential functions of her job if she were relocated to a work area with no water damage, obvious mold contamination, or dust mite exposure, either temporarily or long term. *See* Def. Ex. 28 [Dkt. 58-3] at 5. It was not until August 25, 2014, that Plaintiff made clear that her relocation to a different, mold-free room in the same building was an insufficient accommodation and that she needed to work in another building entirely. *See* Def. Ex. 34 [Dkt. 58-9] at 2–3. Believing that her old work space was sufficiently mold- and dust-mite-free, a Georgetown representative explained that Defendant would not relocate her to another building but would continue to explore her request to be reassigned to a vacant position. *Id.* Georgetown reiterated this denial in an August 28, 2014 request to Plaintiff's health care providers related to her need to be reassigned to a vacant position, explaining that the essential functions of Plaintiff's job require her to be on-site and that any request to work remotely would not be considered. *See* Def. Ex. 37 [Dkt. 58-12] at 3. Accordingly, by late August 2014, both the parameters of Plaintiff's requested accommodation —continuing to work in the Executive Assistant position but from a different building or remotely from home—as well as the Georgetown's denial of that request, were clear. *See Minter v. Dist. of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015) (to establish that an accommodation request was denied, an employee must show that the interactive process, by which an employer engages with an individual to determine the precise limitations resulting from their disability, was ended by the employer).

Setting aside Plaintiff's October 2014 admissions, an employee can nevertheless fail to qualify for protection under the ADA in her current position when the undisputed evidence establishes that no reasonable accommodation could permit the employee to perform the essential functions of her position during the pertinent time period. *See Buie v. Berrien*, 85 F. Supp. 3d 161, 176–77 (D.D.C. 2015). Here, Defendant provided an array of evidence to demonstrate that Plaintiff was required to be on-site to perform the essential functions of her job in August 2014, and that her request to work off-site was thus unreasonable. Indeed, the description for Plaintiff's position—Executive Assistant to the Chief of Police—explains that the position exists for the incumbent to schedule and plan meetings and events, participate in working groups, answer and screen phone calls, give presentations, file papers, fax and photocopy documents, order office supplies, and provide reception services and various other administrative and clerical responsibilities. *See* Def. Ex. 10 [Dkt. 57-10] at 2. The Executive Assistant is also required to report directly to the Chief of Police and other members of the Command Staff, and personally assist them as necessary. *Id.* at 2–4. Her supervisor, Chief Gruber, emphasized as much during her employment, explaining in an email to Georgetown that she needed to be on-site to perform the essential functions of her job and would not be able to work from an off-site location. Def. Ex. 35 [Dkt. 58-10] at 3. Chief Gruber's summary of a meeting in which she shared concerns about Plaintiff's job performance with her similarly underscores the necessity of her presence at work, explaining that Plaintiff was expected to: keep the Uniform Room neat and check in on the room at least once a week; be present at Command Staff meetings to take and then disseminate notes; be present for all scheduled events; and keep Chief Gruber apprised of her whereabouts if she left her workstation for any significant period of time. Def. Ex. 32 [Dkt. 58-7] at 2–3. Likewise, in Chief Gruber's memorandum notifying Plaintiff of her three-day suspension for poor performance, he explained that she frequently arrived to the office late, repeatedly left her workstation without notice, declined to meet with or speak to him and other Command Staff at the office, and refused to attend and take written record of

Add. 20

USCA Case #22-7111    Document #1976043    Filed: 12/02/2022    Page 82 of 90

Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)

2017 WL 4325596

Command Staff meetings. *See* Def. Ex. 44 [Dkt. 58-19] at 2–3. As his Executive Assistant, he explained, "it is essential that [they] meet on a frequent and regular basis." *Id.* at 3. Plaintiff offers no evidence to rebut the abundance of evidence establishing the need for her to be on-site and interacting with Chief Gruber for her job, nor makes any attempt to explain how she would be able to perform its essential functions from an off-site location.

**\*14** Compounding this problem is Plaintiff's self-professed "deep fear" of Chief Gruber, triggered by "any form of contact" with him, that exacerbates her medical ailments. Def. Ex. 49 [Dkt. 58-24] at 2. While Plaintiff denies that an undisclosed anxiety disorder was the root of this or any other problem, there is no genuine dispute that Plaintiff's working relationship with Chief Gruber deteriorated during the course of her employment such that she was unable to appropriately meet and interact with him. *See* Resp. at 10; *see also supra* note 10. Providing clerical and administrative assistance to Chief Gruber and other Command Staff, however, is an undisputed essential function of her job. *See* Def. Ex. 10 [Dkt. 57-10] at 2–4. And, as demonstrated above, it is similarly undisputed that Plaintiff's presence in the office was often required for her to perform that function. Beyond the vague, conclusory, and unsupported assertions in her briefing that she could perform her job if allowed to work off-site and that Georgetown permitted other employees to work remotely, Plaintiff has not come forward with any documentary or testimonial evidence disputing these facts. *See* Pl. SOF at 31–32. Accordingly, the evidence points in only one direction: that it was essential to her job that she be physically present on-site and capable of frequently interacting with her supervisor. The undersigned thus finds that no reasonable fact finder could determine that Plaintiff's requested accommodation—permission to work off-site—would enable her to perform the essential functions of her job that she was otherwise incapable of performing. *See Doak, 798 F.3d at 1106–07* (affirming summary judgment where "overwhelming and undisputed evidence" established "that it was essential to [plaintiff's] job that she be present for interactive meetings during normal business hours and that the accommodations she requested would not have enabled her to perform that function"); *Buie, 85 F. Supp. 3d at 176–77* (granting summary judgment where evidence established that a job required plaintiff's presence and interaction with the public, and plaintiff only offered "self-serving and speculative assertion[s]" that she could perform the job with accommodations); *Weigert v. Georgetown Univ., 120 F. Supp. 2d 1, 14 (D.D.C. 2000)* ("Numerous courts have held that ... stability and the ability to interact with co-workers and supervisors can constitute an essential function." (string citation omitted)).

Accordingly, the undersigned recommends granting Defendant's motion for summary judgment with respect to this aspect of Plaintiff's failure-to-accommodate claim.

### 2. *Plaintiff's Request for Reassignment to a Vacant Position*

The other portion of Plaintiff's failure-to-accommodate claim involves her requests to be reassigned to a vacant position. *See* Am. Compl. at ¶ 41. Plaintiff first made this request on August 12, 2014, after her headache, fatigue, and respiratory issues made it too difficult for her to work in her current position. *See* Def. Ex. 24 [Dkt. 57-24] at 3–4. Though she was advised that reassignment to a vacant position is an accommodation of "last resort," Def. Ex. 27 [Dkt. 58-2] at 2, she made this request again on October 17, 2014, this time alleging that she needed to be reassigned to a vacant position because of her diabetes, *see* Def. Ex. 50 [Dkt. 58-25] at 2–5. In her Amended Complaint and briefing in this matter, Plaintiff makes no effort to differentiate these requests based on the disability that she anticipated they would accommodate, ostensibly claiming instead that Georgetown's responses to both of her requests for reassignment violated the ADA. *See* Am. Compl. at ¶¶ 37–41.

As a preliminary matter and contrary to Defendant's suggestion, the undersigned observes that Plaintiff's inability to perform the essential functions of her Executive Assistant job with or without accommodations did not rid Georgetown of its obligation to consider her request for reassignment to a vacant position for which she was qualified. *See* Def. Mot. at 28, 36–39. After all, the ADA defines a qualified individual as someone who can perform the essential function of a job she "holds or *desires*" and provides that a reasonable accommodation "may include ... reassignment to a vacant position[.]" *42 U.S.C. §§ 12111(8)* and *(9)* (emphasis added). As the D.C. Circuit has explained, to be reassigned to a vacant position, an employee must be able to perform the essential functions of the desired position, with or without reasonable accommodation. *See Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1301 (D.C. Cir. 1998)* (citing *Daugherty v. City of El Paso, 56 F.3d 695, 698–99 (5th Cir. 1995)*). Likewise, "[t]he reassignment 'can only be to an existing, vacant job for which the plaintiff is qualified, and positions to which other employees have a legitimate contractual or seniority right are

Add. 21

2017 WL 4325596

not considered vacant.' " *Harris v. Chao*, —— F. Supp. 3d ——, 2017 WL 2880827, at *6 (D.D.C. July 6, 2017) (quoting *Alston v. Wash. Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 84 (D.D.C. 2008)).

Additionally, the EEOC regulations "instruct employers to 'reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time.' " *Id.* (quoting 29 C.F.R. § Pt. 1630, App.). That said, an employer has no obligation to "reassign an employee to a job that would constitute a promotion." *Id.* Further, the plaintiff bears the burden of demonstrating that "there existed some vacant position to which he [or she] could have been reassigned." *Id.* (citing *Aka*, 156 F.3d at 1304 n.27); *see also Alston*, 571 F. Supp. 2d at 82 ("[P]laintiff bears both the burden of production and the burden of persuasion on the question whether a suitable vacancy existed at the time she sought transfer." (internal citations and quotation marks omitted)).

 **\*15** Here, it is undisputed that Defendant approved Plaintiff's request to be reassigned to a vacant position in January 2015, roughly five months after she first requested it as an accommodation for her rhinitis, by offering her a position as a Recruiting Coordinator. *See* Def. Ex. 72 [Dkt. 59-22] at 2. Plaintiff's claim that this offer nevertheless constituted a denial of a reasonable accommodation is two-fold. First, she contends that the approximately two-month delay between Georgetown's approval of her request and its offer of an alternative position was unreasonable. *See* Am. Compl. at ¶ 38; *see also* Pl. SOF at 33. Second, according to Plaintiff, Georgetown's failure to put her in the Human Resources Analyst or Business Manager position that she wanted was unlawful. *See* Am. Compl. at ¶ 41. Plaintiff is wrong both counts.

While "there are certainly circumstances in which a long-delayed accommodation could be considered unreasonable and hence actionable under the ADA," this is not one of them. *Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (internal quotation and citation marks omitted). Relevant "factors to aid in determining whether a delay was reasonable or unreasonable ... includ[e] the length of the delay, the reasons for the delay, whether the employee was offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith." *Elzeneiny v. Dist. of Columbia*, 125 F. Supp. 3d 18, 38 (D.D.C. 2015) (internal quotation marks and citation omitted). For example, a disputed question of material fact

may exist as to whether an employer unreasonably delayed an employee's request for reasonable accommodations where the employer lost the employee's paperwork on multiple occasions and waited nine months to communicate to the employee that he needed to provide a medical release form. *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 62–63, 70 (D.D.C. 2005). Likewise, a court may decline to grant summary judgment where an employee has averred that it took her employer "almost a year to provide specific guidance as to the kind of medical document it required" to process her accommodations request, *Breen v. Dep't. of Transp.*, 282 F.3d 839, 844 n.7 (D.C. Cir. 2002), or where the employer's sole argument in favor of summary judgment is that the employee eventually received an accommodation after a three-year delay, *Leiterman v. Johnson*, 60 F. Supp. 3d 166, 181 (D.D.C. 2014). On the other hand, "[a] relatively short delay of a few weeks (or even a few months) in approving a request ... does not support" a failure-to-accommodate claim. *Marks v. Washington Wholesale Liquor Co. LLC*, —— F. Supp. 3d ——, 2017 WL 2312860, at *10 (D.D.C. May 26, 2017) (collecting cases); *see also Clayborne v. Potter*, 448 F. Supp. 2d 185, 192–93 (D.D.C. 2006) (granting summary judgment where employer worked with a reasonable "accommodation committee" to find appropriate reassignment for employee over a twelve-month period). This is particularly true where the plaintiff relies solely on her own vague declarations of unlawful delay to support her claim. *See Elzeneiny*, 125 F. Supp. 3d at 38.

Applying these standards here, it is clear, based on the evidence proffered by both parties, that no reasonable jury could find that Defendant's response to Plaintiff's request for reassignment to a vacant position constitutes an unreasonable delay actionable under the ADA. The extent of Plaintiff's argument with respect to this claim, which is raised in her statement of facts, is that Georgetown "warning [her] on November 30, 2014 that the process [for finding a vacant position for reassignment] 'may take some time to complete.' was another unnecessary delay and failure to accommodate [her] when she had requested to be reassigned to the HR Analyst position, which was vacant." Pl. SOF at 33 (providing no citation to the record). Considering that Plaintiff's request for reassignment was met by Defendant less than two months after a Georgetown representative sent the communication that Plaintiff is referencing in her bald assertion, "[t]his is obviously insufficient evidence to go to a jury," and summary judgment is thus appropriate. *See Elzeneiny*, 125 F. Supp. 3d at 38.

Add. 22

USCA Case #22-7111     Document #1976043     Filed: 12/02/2022     Page 84 of 90

**Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)**

2017 WL 4325596

**\*16** Indeed, much like in *Marks*, the undersigned is "reluctant to even call [Georgetown's] actions a 'delay' given that [it] sought to engage [Plaintiff] in a discussion about the scope of [her] need for an accommodation during this interval." *Marks*, —— F. Supp. 3d ——, 2017 WL 2312860 at \*11; *see also Claiborne*, 448 F. Supp. 2d at 192–93. But even assuming that the delay in meeting Plaintiff's request for reassignment to a vacant position can be deemed unreasonable, all evidence indicates that Plaintiff was the primary cause for this delay. It is undisputed, for example, that Plaintiff took affirmative steps to limit the availability of information regarding her medical conditions from Defendant —instructing her physicians not to respond to Georgetown's requests—and only turned over additional information in response to multiple requests a few months before ultimately receiving the offer of reassignment. *See* Def. Ex. 5 [Dkt. 57-5] at 5, 11, 12, 14; *see also* Ex. 62 [Dkt. 59-12] at 2; Pl. SOF. At 35. Further, Defendant has provided uncontested evidence to support its assertion that, during this period, IDEAA and Human Resources employees worked to find an appropriate, available position for Plaintiff. Def. Ex. 63 [Dkt. 59-13] at 2; *see also* Def. Exs. 65–71 [Dkts. 59-15–59-21]. Plaintiff, on the other hand, has pointed to no evidence beyond her own conclusory assertions to support a finding that Georgetown intentionally or unreasonably delayed responding to her request, or that Georgetown did anything to disrupt the informal, interactive process for making accommodations under the ADA. [14] Without such evidence, Plaintiff is unable to make a failure-to-accommodate claim based on any delay in Georgetown's offer of reassignment. *See Elzeneiny*, 125 F. Supp. 3d at 38 (finding that plaintiff's citation to "her own declaration, in which she states in very general terms that she requested a variety of accommodations and that, while 'many' of these were provided, 'it was months before [she received many of the[m]' " is "obviously insufficient evidence to go to a jury."); *Claiborne v. Potter*, 448 F. Supp. 2d 185, 192 (D.D.C. 2006). [15]

---

[14]   *See, e.g.*, Pl. SOF at 33 ("Mr. Smith warning on November 30, 2014 that the process 'may take some time to complete.' was another unnecessary delay and failure to accommodate Ms. Mack when she had requested to be reassigned to the HR Analyst position, which was vacant." (providing no citation to the record)); *id.* at 35 ("To help in this process, Ms. Mack responded by finding a vacancy with the HR Analyst position on November 26, 2016 as confirmed by the hiring manager, Mr.

Ramos. However, Georgetown continued failed [sic] to provide Ms. Mack with a reasonable accommodation for her disabilities." (providing no citations to the record)); Resp. at 13–14 ("Plaintiff ... will show that Georgetown willingly and knowingly refused to engage in the interactive process with Ms. Mack in good faith, failed to provide a reasonable accommodation to Ms. Mack, who was (and is) a qualified individual with disabilities." (providing no citation to the record)).

[15]   In her briefing, Plaintiff appears to argue that Defendant's response to her request for accommodations for her type 2 diabetes was also unreasonably delayed. *See* Resp. at 1–2. It is unclear, based on her Amended Complaint, whether she intended to plead such a claim, *see* Am. Compl. at ¶¶ 14–16, 38, but, assuming *arguendo* that she did, she has provided no evidence to establish that the undisputed ten-day period between her submission of an accommodation request form for her diabetes on July 14, 2014 and the implementation of an ADA accommodation plan on July 24, 2014 constituted an unreasonable delay. *See* Def. Ex. 14 [Dkt. 57-14] at 2–3; *see also* Def. Ex. 16 [Dkt. 57-16] at 2–4. And while she claims in her Amended Complaint that she requested accommodations for her diabetes in April 2014, she provides no evidentiary support for this assertion and appears to have acknowledged at her deposition that she first requested accommodations for diabetes in July 2014. *See* Am. Compl. at ¶ 14; *see also* Def. Ex. 1 [Dkt. 57-1] at 100:10–101:4. Accordingly, to the extent Plaintiff is claiming that Defendant's response to her request for accommodations for her diabetes was unreasonably delayed so as to be actionable under the ADA, the undersigned recommends granting Defendant's motion for summary judgment on that claim as well. *See* Def. Mot. at 33–35.

Likewise, Plaintiff's claim that Defendant's refusal to offer her either the Human Resources Analyst or Business Manager positions constitutes a denial of reasonable accommodations is without merit. Under the ADA, "an employer is not required to provide an employee that accommodation [she] requests or prefers, the employer need only provide some reasonable accommodation." *Aka*, 156 F.3d at 1305 (internal citations and quotation marks omitted). In the context of a reassignment request, "the 'reassignment need not involve

Add. 23

USCA Case #22-7111     Document #1976043     Filed: 12/02/2022     Page 85 of 90

**Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)**

2017 WL 4325596

a promotion' and the 'employer has the authority to pick and choose which appropriate vacant job is to be offered to the otherwise qualified disabled employee.' " *Alston*, 571 F. Supp. 2d at 84 (quoting *Smith v. Midland Brake Inc.*, 180 F.3d 1154, 1170 (10th Cir. 1999)). The reassignment should, however, be to "an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time." 29 C.F.R. App. § 1630.2(o). Thus, "to prevail on an ADA claim where the employer has offered reassignment as a reasonable accommodation, the employee must offer evidence showing both that the position offered was inferior to her former job and that a comparable position, for which the employee was qualified, was open." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999). If no such position exists, an employer is permitted to "demote" an employee through reassignment to an inferior position. *Harris*, ——— F. Supp. 3d ———, 2017 WL 2880827, at *7 (citing 29 C.F.R. § Pt. 1630, App.).

\*17 Without determining whether the Recruiting Coordinator position that Georgetown offered Plaintiff for reassignment constitutes a demotion, [16] the undersigned finds that Plaintiff has failed to satisfy her burden of identifying another available position for which she was qualified. *See Alston*, 571 F. Supp. 2d at 84 ("The plaintiff bears the burden of showing that a vacant position exists and that ... [she] is qualified for that position.") (quoting *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997)). To be qualified for a position, an individual must not only be able to perform the essential functions of the job, but must also satisfy "the requisite skill, experience, education, and other job-related requirements" of that job. 29 C.F.R. § 1630.2(m). A review of Plaintiff's submissions to the Court reveals, at most, two positions that she believes she was qualified for: Business Manager and Human Resources Analyst. *See* Pl. SOF at 31–36. As she acknowledges, however, the Human Resources Analyst position was filled before she and Georgetown could complete the ADA's required interactive process, and the Business Manager position required three to five years of managerial experience. *See* Am. Compl. at ¶¶ 37–41; *see also* Def. Ex. 76 [Dkt. 60-1] at 4. At the time she sought reassignment, a Human Resources specialist at Georgetown explained to Plaintiff that, based on her resume, which establishes that she worked exclusively as an administrative or executive assistant since 2001, she lacked the requisite managerial experience for the Business Manager position. *See* Def. Ex. 6 [Dkt. 57-6] at 2–8; *see also* Def. Ex. 74 [Dkt. 59-24] at 2–3. And while Plaintiff now

argues that she has over six years of managerial experience based on her employment as an administrative assistant at Lawrence Technological University, *see* Pl. SOF at 39–40, she provides no affirmative evidence to support this assertion and instead asks the Court to rely exclusively on the unsupported representations in her statement of facts to deny summary judgment. Based on the record as it stands, the undersigned is reluctant to do so. *See Alston*, 571 F. Supp. 2d at 84–85 (finding factual dispute with regard to the defendant's failure to provide reassignment where the plaintiff "submitted a report from a vocational rehabilitation expert indicating that she was qualified to perform" the vacant position and deposition testimony from the defendant's corporate designee indicating that she met the minimum qualifications for the vacant position); *Drasek v. Burwell*, 121 F. Supp. 3d 143, 159–60 (D.D.C. 2015) (finding genuine dispute of fact with regard to the plaintiff's ability to perform the essential functions of a vacant position where the record established that she had performed the functions of the same position for a previous employer and where her physician opined that her current failure to perform was due to her specific work environment).

[16]    As Plaintiff notes, again without citation to any documentary or testimonial evidence, the Recruiting Coordinator position paid $5,000 less per year than the Executive Assistant position and appears to require occasional travel and extended hours. *See* Pl. SOF at 35–36. On the other hand, both positions are Grade 9, involve semi-complex work, and provide general supervision. *See* Def. Ex. 10 [Dkt. 57-10] at 2–4; *see also* Def. Ex. 72 [Dkt. 59-22] at 2–9.

Indeed, Plaintiff is unable to point the Court to any evidence in support of her qualifications for the Business Manager position other than the claims she made in her statement of facts, which, by themselves, are insufficient to create a genuine dispute of material fact. *See McBride v. BIC Consumer Prod. Mfg. Co., Inc.*, 583 F.3d 92, 99 (2d Cir. 2009) ("[Plaintiff] has provided no evidence ... indicating ... that she possessed the requisite educational background or professional skills and experience [for the vacant position]. Neither her conclusory assertion in an affidavit that she was qualified for the then-available positions nor her counsel's unsubstantiated statements before the district court remedy this defect."); *see also Nordhoff v. Johnson*, 81 Fed.Appx. 885, 889 (7th Cir. 2003) (affirming summary judgment on a failure-to-accommodate claim where employee relied solely on his own "conclusory statements and unsubstantiated, self-

Add. 24

**Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)**

2017 WL 4325596

serving affidavit" to argue that he met the educational and experiential requirements for a vacant position); *Moore v. Computer Assoc. Int'l, Inc.*, 2010 WL 11515202, at *2 (D. Ariz. Sept. 7, 2010) ("Plaintiff's own testimony regarding his ability to perform the position [to which he hoped to be reassigned] is not sufficient to create a genuine issue of material fact regarding such ability, when Defendant cited medical evaluations strongly suggesting Plaintiff could not perform the position."); *Hinson v. U.S.D. No. 500*, 187 F. Supp. 2d 1297, 1309 (D. Kan. 2002) (granting summary judgment where Plaintiff relied solely on his alleged previous experience as a manager and his own opinions about his qualifications to establish that he was qualified for reassignment to a "food service manager position"). Finding that Plaintiff has failed to produce any evidence beyond her own unsupported statements to create a genuine issue as to whether a vacant position for which she was qualified and to which she could have been reassigned existed, the undersigned recommends granting Defendant's motion for summary judgment on this claim.

### B. Plaintiff's Retaliation Claim
The next claim raised in Plaintiff's Amended Complaint alleges that Georgetown retaliated against her for seeking accommodations for her disabilities. *See* Am. Compl. at ¶ 46. The ADA makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of ... any right granted or protected" by the ADA. 42 U.S.C. § 12203(b). When, as here, the plaintiff does not offer direct evidence of reprisal and instead relies on circumstantial evidence to support her claim,[17] courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Smith v. Dist. of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (using *McDonnell Douglas* to evaluate ADA retaliation claim). Under that framework, the plaintiff must first establish the three elements of a prima facie case of retaliation: (1) that she engaged in a protected activity under the ADA; (2) that the employer took a materially adverse action against her; (3) that "there existed a causal linked between the adverse action and the protected activity." *Id.* (quoting *Jones v. Wash. Metro. Area Transit Auth.*, 205 F.3d 428, 433 (D.C. Cir. 2000)). Once a plaintiff succeeds in making her prima facie showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory reason for its action. *Id.* If the employer successfully does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext

masking discrimination or retaliation. *Id.*; *see also Anakor v. Archuleta*, 79 F. Supp. 3d 257, 262 (D.D.C. 2015).

17    "Direct evidence of [retaliation] is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference. Such evidence includes any statement or written document showing a discriminatory motive on its face." *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (internal citation, quotation marks, and alterations omitted). Plaintiff presents no such evidence here.

**\*18**  Where a defendant offers a legitimate, non-retaliatory reason for its actions, however, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under [the] *McDonnell Douglas* [framework]." *Ellis v. Georgetown Univ. Hosp.*, 723 F. Supp. 2d 42, 52 (D.D.C. 2010) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). In those circumstances, the only question to consider in determining whether to grant an employer's motion for summary judgment is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the plaintiff on a prohibited basis." *Id.* (internal citation and quotation marks omitted); *see also Walker v. Children's Nat'l Med. Ctr.*, —— F. Supp. 3d ——, 2017 WL 680374, at *5 (D.D.C. Feb. 21, 2017) ("At the summary judgment stage, the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." (internal quotation marks and alterations omitted)). In answering this central inquiry, "the court reviews each of the three categories of evidence [presented by the plaintiff]—prima facie, pretext, and any other—to determine whether they either separately or in combination provide sufficient evidence for a reasonable jury to infer retaliation." *Ellis*, 723 F. Supp. 2d at 52 (quoting *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009)).

Here, Plaintiff has identified three categories of materially adverse actions that make up her claim of retaliation: unspecified threats from her supervisor, Chief Gruber, from July through September 2014; her suspension in November 2014; and her termination in March 2015. *See* Def. Ex. 96 [Dkt. 60-21] at 3–4; *see also* Def. Ex. 1 [Dkt. 57-1] at 32:5–

Add. 25

2017 WL 4325596

32:9. [18] Defendant does not dispute that Plaintiff engaged in protected activity under the ADA, and instead contends that Plaintiff has failed to establish that the threats from her supervisor are adverse employment actions, and that her suspension and termination were motivated by retaliation. *See* Def. Mot. at 41–45. Defendant is correct on both counts.

[18]    Specifically, in a response to Defendant's interrogatory, Plaintiff indicates that she was threatened by Chief Gruber on: July 16, 2014; August 25, 2014; August 28, 2014; September 3, 2014; September 5, 2014; and September 9, 2014. *See* Def. Ex. 96 [Dkt. 60-21] at 3–4. She does not provide any details of the alleged threats in her interrogatory response, and parsing her Amended Complaint provides little clarity. At a minimum, Plaintiff appears to believe that she was improperly threatened with disciplinary action by Chief Gruber when he informed her that she was expected to report to work in the DPS building on August 26, 2014, and again when Chief Gruber denied her request to work remotely on August 27, 2014. *See* Am. Compl. at ¶¶ 23, 26. Additionally, the September 5 and 9, 2014 dates identified by Plaintiff in her interrogatory response presumably refer to Plaintiff's allegations that Chief Gruber behaved in an intimidating and threatening manner—allegations that Georgetown's Human Resources Department found to be unfounded—but Plaintiff does not explicitly state that.

### 1. Threats from Plaintiff's Supervisor

While Plaintiff fails to clearly identify the specific threats of disciplinary action from her supervisor that make up her retaliation claim, *see supra* note 18, the undersigned finds that Defendant is entitled to summary judgment on this issue regardless of which incidents in her Amended Complaint she may have been referencing. While actionable "[a]dverse actions in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim" and need not necessarily "affect the terms and conditions of [a claimant's] employment," an employee bringing a claim of retaliation under the ADA must nevertheless establish that a reasonable employee would have found the action materially adverse. *Paschal v. Dist. of Columbia*, 65 F. Supp. 3d 172, 177 (D.D.C. 2014); *see also Hargrove v. AARP*, 205 F. Supp. 3d 96, 115 (D.D.C. 2016). Notably, "[a] long line of cases

from this Circuit and others have held that threats, revoked disciplinary plans, and other such ultimately unconsummated actions are not materially adverse for purposes of retaliation claims." *McNair v. Dist. of Columbia*, 903 F. Supp. 2d 71, 75–76 (D.D.C. 2012) (collecting cases and entering judgment against claim of retaliation brought under the ADA). In fact, this Court has found on a number of occasions that the actions of which Plaintiff now complains—unspecified and unrealized threats of disciplinary action from Chief Gruber —are not adverse employment actions. *See id.* (finding that receipt of a letter threatening employee with termination does not constitute an adverse employment action); *see also Mahoney v. Donovan*, 824 F. Supp. 2d 49, 61–62 (D.D.C. 2011) ("[W]hile actually subjecting Plaintiff to disciplinary action may have amounted to materially adverse action, merely advising him via email that if he continued a course of action he *might* be subject to discipline does not."); *Bailey v. Wash. Metro. Area Transit Auth.*, 810 F. Supp. 2d 295, 301 (D.D.C. 2011) ("[N]o reasonable jury could find that the proffer of a severance package and a resulting discussion constituted a materially adverse employment action.").

**\*19** Though the undersigned "does not doubt that it was both unpleasant and disconcerting" for Plaintiff to hear Chief Gruber threatening her with disciplinary action or critiquing her job performance, neither her bald allegations nor the statements from other DPS employees that she provided establish that Chief Gruber's critiques imposed a tangible harm on her. *McNair*, 903 F. Supp. 2d at 76; *Rashad v. Wash. Metro. Area Transit Auth.*, 945 F. Supp. 2d 152, 164–65 (D.D.C. 2013) (letter of reprimand containing job-related constructive criticism and no abusive language was not a materially adverse employment action). "As our Circuit notes, 'not everything that makes an employee unhappy is an actionable adverse action.' " *McNair*, 903 F. Supp. 2d at 76 (quoting *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006)). Having found no evidence that a reasonable jury could conclude that Plaintiff experienced an adverse employment action due to her supervisor's alleged threats, the undersigned recommends granting Defendant's motion for summary judgment with respect to this element of her retaliation claim.

### 2. Plaintiff's Suspension

Defendant is also entitled to summary judgment on Plaintiff's claim that her three-day suspension, which was issued on October 14, 2014 and effectively served from November 24

Add. 26

2017 WL 4325596

to November 26, 2014, was a materially adverse action taken by Georgetown in retaliation for her protected activity. As a preliminary matter, in response to Defendant's interrogatory requesting a recitation of all the alleged instances of retaliation, Plaintiff claims that the suspension was a response to her seeking medical accommodations "due to [her] anxiety disorder" on September 5 and September 9, 2014. Def. Ex. 96 [Dkt. 60-21] at 3–4; *see also* Am. Compl. at ¶ 33. There is no record of Plaintiff notifying Georgetown of her anxiety disorder or seeking reasonable accommodations for it while working there. *See supra* note 10. But even assuming that Plaintiff erred when she referenced her anxiety disorder in her response to Plaintiff's interrogatory, she has failed to produce evidence sufficient to counter Defendant's explanation that the suspension was a legitimate response to Plaintiff's "repeated and well-documented performance issues." Def. Mot. at 43.

In various portions of her submissions to this Court, Plaintiff's appears to contend that the suspension was motivated by either the incidents with Chief Gruber that occurred on September 5 and September 9, 2014, or perhaps for her seeking reassignment. Am. Compl. at ¶¶ 33, 36; *see also* Pl. SOF at 31, 41. She provides no documentary or testimonial evidence to support either assertion, instead relying on her own vague and conclusory statements. [19] Conversely, Defendant has provided documentation of two meetings—one on August 4, 2014, and another on August 26, 2014—in which her supervisor, Chief Gruber, informed her of deficiencies in her work performance and instructed her on areas in which she could improve. *See* Def. Ex. 19 [Dkt. 57-19] at 2–3; *see also* Def. Ex. 32 [Dkt. 58-7] at 2–3. Notably, Plaintiff's first meeting with Chief Gruber predates all protected activity in this case with the exception of her first disability accommodation request form related to her diabetes, which she submitted on July 14, 2014. Def. Ex. 14 [Dkt. 57-14]. What is more, Defendant produced a copy of a written warning, prepared on September 5, 2014, explaining that Plaintiff continued to perform below expectations at work and highlighting the specific instances in which she fell short. *See* Def. Ex. 45 [Dkt. 58-20] at 2. The written warning also instructs Plaintiff that her "[f]ailure to achieve prompt and continuing resolution of these performance deficiencies will result in progressive disciplinary action up [to] and including termination of [her] employment[.]" *Id.* Finally, Chief Gruber's October 14, 2014 notice to Plaintiff informing her of her three-day suspension makes specific reference to the incidents that precipitated both performance review meetings and this written warning, highlighting the various

ways in which she failed to improve her performance leading up to her suspension and expressing significant concern about these deficiencies. *See* Def. Ex. 44 [Dkt. 58-19] at 2–4. [20]

[19] *See, e.g.*, Pl. SOF at 31 ("Ms. Mack served her three-day suspension on November 24, 2014 through November 26, 2014 as instructed via Mr. Smith due to a pretextual reason." (providing no citation to the record)); *id.* at 41 ("Georgetown did not engage in the interactive process in good faith, but subjected Ms. Mack to a hostile work environment and took retaliation against Ms. Mack with adverse employment actions of threats, a three (3) day suspension and by terminating her for failing '... to accept the reassignment which the University has offered' as a demotion even when Georgetown knew that viable reassignments were available." (providing no citation to the record)); Resp. at 12 ("Ms. Mack was subjected to adverse employment actions against Ms. Mack from Chief Gruber in the form of threats, letters of warning, suspended without pay for 3-days, and was terminated because I had requested a reassignment to a vacant position that was equivalent in terms of pay, status, and other relevant factors, but instead I was offered a demoted position when Georgetown know that other equivalent positions were vacant or would became vacant that I had qualified for. There is a causal link between Ms. Mack's adverse employment actions that she was subjected to and her protected activities." (providing no citation to the record)).

[20] To summarize, Plaintiff's performance issues involved: her repeated failure to take and promptly provide notes from Command Staff meetings; her failure to maintain Chief Gruber's calendar and answer phones; her difficulty with managing her time at work independently; her failure to complete tasks assigned to her; her failure to keep the "Uniform Room" in order; her repeated and unexplained tardiness; her failure to attend calendar appointments and subsequent untruthfulness; and her repeated and unexplained absences. *See* Def. Ex. 19 [Dkt. 57-19] at 2–3; Def. Ex. 32 [58-7] at 2; Def. Ex. 44 [Dkt. 58-19] at 2–4; and Def. Ex. 45 [Dkt. 58-20] at 2.

**\*20** In short, Defendant has offered a legitimate and non-discriminatory reason for its decision to suspend Plaintiff.

2017 WL 4325596

*See Richardson v. Petasis*, 160 F. Supp. 3d 88, 20 (D.D.C. 2015) (finding that "insubordination" and "unsatisfactory performance" are "commonly asserted legitimate, non-discriminatory reasons" for employee suspension); *see also Drewrey v. Clinton*, 763 F. Supp. 2d 54, 63 (D.D.C. 2011) (same). In turn, Plaintiff has failed to present any concrete evidence—not even her own sworn statement refuting Defendant's characterization of the events—to undercut Defendant's explanation for her suspension or support her own theory of this case. Plaintiff's bald and conclusory assertions that her suspension was motivated by discriminatory intent, unsupported by any evidence in the record beyond mere temporal proximity to her engagement in protected activity, are "insufficient to raise a genuine issue of material fact regarding the falsity of [D]efendant's justifications." *See id.*; *see also Minter*, 809 F.3d at 71–72 ("[P]ositive evidence beyond mere [temporal] proximity is required to create a genuine issue of material fact concerning whether the motive for an adverse employment action was retaliation.") (internal citations and quotation marks omitted); *Vickers v. Powell*, 493 F.3d 186, 195–96 (D.C. Cir. 2007) (finding, in the context of a Title VII retaliation claim, that no reasonable jury could infer a retaliatory motive based solely on a plaintiff's allegations). Put differently, she has failed to establish that "but for" her protected activity, she would not have been terminated, and the undersigned thus recommends granting Defendant's motion for summary judgment with respect to this claim. *See Walker*, 2017 WL 680374, at *5 (applying the "traditional principles of but-for causation," whereby a plaintiff must prove that the unlawful retaliation would not have occurred absent the alleged wrongful action of the employer, in adjudicating a motion for summary judgment on an ADA retaliation claim).

### 3. Plaintiff's Termination

Plaintiff's final allegation of retaliation—that she was effectively fired by Georgetown for seeking accommodations under the ADA—fares no better than the rest. *See* Am. Compl. at ¶¶ 45–46; Def. Ex. 96 [Dkt. 60-21] at 3–4. Setting aside Defendant's detailed and well-supported description of Georgetown's efforts to reassign Plaintiff to an appropriate position once it became clear that she was incapable of performing the essential functions of her job, the gist of this iteration of Plaintiff's retaliation claim is obscured by the fact that she raised this exact issue in what the undersigned has liberally construed to be the first count of her Amended Complaint. *See supra* at 31–39. Indeed,

Plaintiff specifically challenges Defendant's failure to provide her with a reassignment to the position of her choosing as a failure to provide a reasonable accommodation under the ADA. *See* Am. Compl. at ¶ 44. The subject of a failure-to-accommodate claim, however, cannot "supply grounds for a separate retaliation claim." *Buie v. Berrien*, 85 F. Supp. 3d 161, 178 (D.D.C. 2015) (citing *Floyd*, 968 F. Supp. 2d at 334). Indeed, "if the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled." *Floyd*, 968 F. Supp. 2d at 334.

In any event, Plaintiff has failed to present any evidence to refute Defendant's legitimate and non-discriminatory justification for terminating Plaintiff: that she was no longer able to complete the essential functions of her job as an Executive Assistant, was offered reassignment to a position as a Recruiting Coordinator as a reasonable accommodation, and was fired after rejecting that offer because she wanted to be reassigned to a position for which she was not qualified. *See supra* at pp. 17–20. Having refused Georgetown's offer of reasonable accommodation, Plaintiff can no longer claim that Defendant had a duty to accommodate her further. *See* 29 C.F.R. § 1630.9(d) ("If [an individual with a disability] rejects a reasonable accommodation ... that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered qualified [under the ADA]."); *Hall v. Claussen*, 6 Fed.Appx. 655, 666 (10th Cir. 2001) ("[I]f the employee rejects an offer of reassignment that is consistent with an employer's duties of reasonable accommodation under the ADA, the employer is not required to offer additional reassignment."); *Midland Brake, Inc.*, 180 F.3d at 1177 ("The ADA does not entitle an employee to a free ranging or perpetual right to a new position within the company.... Once the employer has offered ... a reassignment [to a vacant position for which the employee is qualified], its duties have been discharged.").

**\*21** Accordingly, the undersigned recommends that Defendant's motion for summary judgment be granted on this count.

### CONCLUSION

The undersigned finds that Plaintiff has failed to allege facts sufficient to show that Defendant discriminated

**Mack v. Georgetown University, Not Reported in Fed. Supp. (2017)**

2017 WL 4325596

against her by denying her reasonable accommodations, or that Defendant retaliated against her for requesting reasonable accommodations for her disabilities. Moreover, the undersigned finds that Defendant is entitled to judgment as a matter of law on Plaintiff's claims. Accordingly, and for the reasons stated, the undersigned recommends that the Court grant Defendant's motion for summary judgment.

\* \* \* \* \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District court for the District of Columbia, any party who objects to this Report and Recommendation must file a written objection thereto with the Clerk of this Court within fourteen (14) days of the party's receipt of the Report and Recommendation. The written objections must specifically identify the portion of the Report and Recommendation to which the objection is made, and the basis for such objections. The parties are further advised that the failure to timely file objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court adopting such findings and recommendations. *See Thomas v. Arn*, 474 U.S. 140 (1985).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4325596

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add. 29